UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ERNST THEODORE TENEMILLE,

Plaintiff,

v.

TOWN OF RAMAPO, *et al.*,

Defendants.

No. 18-CV-724 (KMK)

OPINION & ORDER

---

Appearances:

Christopher Young, Esq.
The Young Law Firm
Washington, D.C.
*Counsel for Plaintiff*

Dayton P. Haigney, III, Esq.
Dayton P. Haigney
New York, NY
*Counsel for Plaintiff*

Steven C. Stern, Esq.
Vernee Ciara Pelage, Esq.
Sokoloff Stern LLP
Carle Place, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

Plaintiff Ernst Theodore Tenemille ("Plaintiff") brings this Action against the Town of

Ramapo (the "Town" or "Ramapo"), Town of Ramapo Police Department (the "Police

Department"), former Town Supervisor Christopher St. Lawrence ("St. Lawrence"), Councilman

Patrick Withers ("Withers"), Chief of Police Bradley R. Weidel ("Weidel"), Chief of Staff

Thomas Cokeley ("Cokeley"), Police Lieutenant ("Lt.") David Holmes ("Holmes"), former

Administrative Lt. William Gravina ("Gravina"), Squad Lt. Daniel Hyman ("Hyman"), Detective

Sergeant ("Sgt.") Brian Corbett ("Corbett"), Squad Sgt. Salomon Matos ("Matos"), Desk Sgt.

Christopher Franklin ("Franklin"), and Police Sgt. Al Gumbs ("Gumbs"), alleging that

Defendants retaliated against him on the basis of his race, color, national origin, and religion, in

violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 200e, *et seq.*; 42

U.S.C. § 1981; and New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290, *et*

*seq.* (*See generally* Third Am. Compl. ("TAC") (Dkt. No. 67).) Before the Court is a Motion To

Dismiss (the "Motion"), pursuant to Federal Rules of Civil Procedure 12(b)(6), filed by the

Town, the Police Department, Weidel, Cokeley, Holmes, Hyman, Corbett, Matos, and Franklin

(the "Moving Defendants"). (Not. of Mot. (Dkt. No. 72).)[1]  For the reasons discussed below, the

Motion is granted.

## I.  Background

### A.  Factual Background

The following facts are drawn from Plaintiff's TAC and are assumed to be true for the

purpose of resolving the instant Motion.

Plaintiff is a 47-year-old Haitian American who immigrated to the United States from

Haiti in 1984. (TAC ¶ 29.) After graduating from high school in 1988, Plaintiff joined the U.S.

Navy, from which he was honorably discharged in 1997. (*Id.* ¶¶ 29–30.) Plaintiff then

graduated from State University of New York ("SUNY") Rockland Community College in 1999

with an associate's degree in criminal justice and from SUNY Purchase in May 2017 with a

bachelor's degree in liberal studies and a minor in psychology. (*Id.* ¶ 30.)

---

[1] Defendants St. Lawrence, Withers, Gravina, and Gumbs have not appeared in this Action, and, according to Moving Defendants, "[u]pon information and belief," they were never served. (Moving Defs.' Mem. of Law in Supp. of Mot. ("Moving Defs.' Mem.") 19 n.7 (Dkt. No. 74).) Plaintiff filed affidavits of service indicating that these Defendants were served at Ramapo's Town Hall, (Dkt. Nos. 6, 7, 11, 16), but Moving Defendants represent that these Defendants were not associated with or employed by the Town when service occurred, (Moving Defs.' Mem. 19 n.7).

In 2000, Plaintiff joined the Rockland Sheriff's Department as a Correction Officer. (*Id.* ¶ 31.)  In 2002, he was hired by the Town as a police officer. (*Id.*)  In the same year, Plaintiff attended the Rockland County Police Academy. (*Id.* ¶ 34.)  While there, he was "abruptly pulled out of his training" and asked questions about alleged inaccuracies in his background report. (*Id.*)  According to Plaintiff, the detectives who conducted his background check for the Police Department could not confirm his service with the Navy, and claimed that the copy of the "U.S. Navy service discharge form (DD-214)" provided by Plaintiff was fraudulent. (*Id.*)  Weidel, who was an administrative sergeant at the time, led this investigation, and questioned whether Plaintiff had instead served in the Republic of Haiti's Navy and whether Plaintiff had falsified information on his application, including his age. (*Id.* ¶¶ 34–35.)  Plaintiff was "in fear of losing his employment" due to this incident. (*Id.* ¶ 35.)  However, the information on Plaintiff's application was confirmed, but no disciplinary action was taken against Weidel or the detectives who performed the investigation. (*Id.* ¶¶ 35–36.)

In December 2004, Plaintiff heard Corbett, who is white, engage in a "heated rant" against him, during which Corbett stated that Plaintiff "d[idn't] belong" at the Police Department, and that he "need[ed] to go back to where he came from if they will have him." (*Id.* ¶¶ 37–38 (quotation marks omitted).)  Corbett then stated that "they [African Americans] only have [two-fifths] of a brain anyway." (*Id.* ¶ 38 (first alteration in original) (quotation marks omitted).)  Plaintiff complained to his supervisors about these statements, but Corbett was promoted shortly after this incident and was not "reprimanded or disciplined in any way." (*Id.* ¶ 39.)

Plaintiff was also "continually advised that he needed to improve his report writing skills," and was told that he had "illegible handwriting." (*Id.* ¶ 40 (quotation marks omitted).)

Corbett was Plaintiff's immediate supervisor at the time.  (*Id.*)  Plaintiff turned in a report on a

domestic violence incident to Corbett that contained several errors that had been covered with

white-out, and Plaintiff asked Corbett if he could re-copy the report.  (*Id.*)  Corbett replied that

the report was fine, and ultimately reviewed and approved it.  (*Id.*)  However, the same report

was later flagged "further up the chain of command" as "messy and unprofessional," and Corbett

then wrote up Plaintiff for "turning in a messy report," despite his earlier approval.  (*Id.*

(quotation marks omitted).)  Plaintiff was then required to retake a "videotaped[] course on

report writing," which he had already taken and passed at the Rockland County Police Academy.

(*Id.* ¶ 41.)  Plaintiff alleges that Corbett "knowingly insist[ed] that [the] domestic report be

pushed up the chain of command," which resulted in a "green sheet (supervisory contact

report)," and was raised with Plaintiff's supervisors.  (*Id.*)  According to Plaintiff, this green

sheet was "used as a basis for the actions, which led to [Plaintiff's] termination" in 2016.  (*Id.*)

 Due to the complaints he received about his handwriting, Plaintiff began typing his

reports.  (*Id.* ¶ 40.)  Soon after the incident with the report given to Corbett, Holmes summoned

Plaintiff to speak to him with Sgt. Reynar, and "expressed surprise" at the improved quality of

Plaintiff's reports.  (*Id.* ¶ 42.)  During this meeting, Holmes speculated that "perhaps [Plaintiff]

was having his wife complete the reports for him."  (*Id.* (quotation marks omitted).)

Additionally, Plaintiff's annual evaluation did not include mention of his improved reports.  (*Id.*)

Generally, Plaintiff alleges that he was "constantly under-evaluated[,] . . . all in . . . [D]efendants'

concerted effort to bolster the . . . Police Department's aim of terminating him," and that he

frequently received lower scores than "a majority of [w]hite officers whose productivity were

[sic] inferior to his."  (*Id.* ¶ 43.)  Instead, Defendants engaged in a pattern of "outright ignoring

[Plaintiff's] positive accomplishments," while other officers received awards for similar

4

accomplishments, and of "highlighting mistakes [for which] most [w]hite officers at worst received warnings." (*Id.* ¶ 44.) For example, in 2004, Plaintiff's annual evaluation did not mention that he had received a "commendation letter for community service" he performed at SUNY Rockland Community College, and even though Plaintiff worked 201 shifts, during which he wrote "numerous reports" and made "numerous arrests," he still received an unsatisfactory evaluation, and his termination was recommended. (*Id.* ¶¶ 44–46.) During this time, he was one of four African-American police officers at the Police Department, and the only one of Haitian descent. (*Id.* ¶ 47.)

In 2005, Plaintiff was written up by now-retired Lt. Leslie Lampert ("Lampert") for "entering a holding cell while armed," which, based on camera footage, was an inaccurate allegation. (*Id.* ¶ 48.) This write-up remained in Plaintiff's personnel file and was used by the Town in 2016 to justify Plaintiff's termination. (*Id.*) In 2006, Franklin, a white male officer, "berated" Plaintiff in front of other officers for a "routine" traffic ticket issued to one of Franklin's friends. (*Id.* ¶¶ 49, 61.) Although Plaintiff complained about this encounter, Franklin was not reprimanded and was promoted shortly after. (*Id.* ¶ 50.)

The following year, Plaintiff was assigned to cover Sector Two, an area that includes the Police Station and the Town Court. (*Id.* ¶ 51.) Plaintiff found that the workload for this sector was heavy, and "often complained . . . and advised" that Sector Two should be split between multiple officers. (*Id.*) In response, Plaintiff was "advised to manage his time better" and "reprimanded for not being able to keep up with his workflow." (*Id.*) However, when Plaintiff was ultimately transferred to a different section of the Town, a white police officer took over Sector Two, and it was deemed to be too large of a workload for one officer and split into two

sectors.  (*Id.* ¶ 52.)  The reprimand letters Plaintiff received were not retracted, and they "resurfaced" during his ultimate termination.  (*Id.*)

Also in 2007, Plaintiff had a two-year old child, and his wife was pregnant with another child.  (*Id.* ¶ 53.)  Plaintiff took a day of sick leave, and he was seen shoveling his driveway, which "led to accusations that [Plaintiff] was abusing his sick leave."  (*Id.* ¶ 54.)  Plaintiff was "served with disciplinary charges and penalized," and received "low marks" on his annual evaluation as a result.  (*Id.*)  Prior to this day, Plaintiff had "rarely used sick leave," and was "commended many times for going years" without taking a day off.  (*Id.* ¶ 53.)  This incident was also raised during Plaintiff's later termination.  (*Id.* ¶ 54.)

In 2008, Plaintiff took a personal day that he "did not have available," and was written up for "[m]isuse of [a]ccumulated [t]ime."  (*Id.* ¶ 55.)  In September 2008, Plaintiff filed a grievance "in connection with securing a modified schedule for religious observance."  (*Id.*)  Three months earlier, a white female officer had done the same.  (*Id.*)  In 2009, Plaintiff filed an "EEOC Complaint (520-2009-00006)" against the Town, which "highlighted the disparities in the way that the religious observations were handled between [Plaintiff] and the white female officer" and documented other incidents, such as Corbett's 2004 remark.  (*Id.* ¶ 56.)  On November 30, 2010, the Equal Employment Opportunity Commission ("EEOC") issued a right to sue letter, but Plaintiff did not file a lawsuit because he "hoped that the threat of a lawsuit would change the culture of the [P]olice [D]epartment."  (*Id.* ¶ 57.)

In May 2010, Plaintiff filed a police report about an au pair he had terminated, and who left his house with a set of Plaintiff's house and car keys.  (*Id.* ¶ 58.)  The Police Department did not try to contact the au pair, and did not investigate Plaintiff's report until he complained to a supervisor about the case, which was handled by Gumbs.  (*Id.*)  According to Plaintiff, Gumbs

told other officers that Plaintiff "likely tried to cheat the [a]u [p]air out of her wages."  (*Id.* (quotation marks omitted).)

One month later, Plaintiff was again written up in a report alleging that he "us[ed] too many rounds . . . to euthanize an injured animal."  (*Id.* ¶ 59.)  Although the Town does not have a policy on euthanizing animals, and Plaintiff had explained that he "felt obligated" to end the animal's suffering after he fired an initial round, Plaintiff underwent "remedial firearms training[,] []which he passed with excellence[.]"  (*Id.*)  The report about this incident and the "green sheet associated with it" remained a part of Plaintiff's personnel file and were referenced when he was later terminated from the Police Department.  (*Id.*)

In December 2012, Plaintiff noticed that traffic tickets he had issued were deleted from the records of the Town and Police Department, and none of Plaintiff's supervisors knew what had happened to them.  (*Id.* ¶ 60.)  Plaintiff lodged a written complaint, for which he was "severely reprimanded, sanctioned[,] and . . . was subjected to a second psychological evaluation and test."  (*Id.*)[2]  This written report was also used in support of Plaintiff's ultimate termination. (*Id.* ¶ 61.)  It was later discovered that Franklin was responsible for the deletion of the tickets, but Franklin was "minimally reprimanded," was not required to undergo a "second psychological test," and was recently promoted by the Police Department.  (*Id.*)

In September 2013, "then PBA president (and now)[] Detective Dennis Procter" used the Police Department's system to solicit personal e-mail addresses of officers "for the political benefit of . . . Withers," who was campaigning for re-election as councilman.  (*Id.* ¶ 62.) Plaintiff was the only officer who declined to provide his email address, which "generated a

---

[2] Plaintiff does not appear to allege when an initial psychological evaluation took place. (*See generally* TAC.)

wave of discriminatory and retaliatory backlash" until Plaintiff was terminated in 2016. (*Id.*) Plaintiff alleges that Withers "played a decisive role" in this reaction. (*Id.*)

During Plaintiff's annual evaluation in 2014, which was delivered by Hyman, it was not mentioned that Plaintiff had stopped an attempted suicide until he protested. (*Id.* ¶ 63.) The evaluation also noted that Plaintiff had had the fourth largest number of arrests in 2014, despite being injured and unable to work for a month, and that he was recommended for a "Lifesaving Award." (*Id.*) Despite these accomplishments, Plaintiff received a rating of "[a]verage" for the year, and he never received the "Lifesaving Award." (*Id.*) Further, "commendation letters" Plaintiff received were omitted from his evaluation, and instead, his evaluation noted that Plaintiff was written up when he responded, "Great idea," to an e-mail sent by Weidel, because Plaintiff "should have known that no response [to the e-mail] was necessary." (*Id.* (quotation marks omitted).)

In 2015, Plaintiff worked until December 1 but did not receive an evaluation for the year, despite the fact that he received three "commendation letters for . . . superior performance," including a letter speaking to the "major role" he played in a "gang assault" case. (*Id.* ¶¶ 65–66.) Instead, in 2015, the process for terminating Plaintiff began, and "hostility [toward Plaintiff] further spiked" after he put a bumper sticker reading "Yes. I voted Obama" on his personal vehicle. (*Id.* ¶ 66 (quotation marks omitted).) On December 1, 2015, Plaintiff received from Matos a written order to sign, approve, notarize, and return within 24 hours a Health Insurance Portability and Accountability Act ("HIPAA") release form, which Plaintiff accepted. (*Id.* ¶ 67.)[3] If Plaintiff did not comply, he would face disciplinary action. (*Id.* ¶ 73.) The order was

---

[3] Plaintiff later alleges that he was presented with this order on November 30, 2015. (*Id.* ¶ 73.)

issued at 11:40 p.m., and Plaintiff returned to request the HIPAA form from Matos five minutes later.  (*Id.*)  Former "PBA president" Detective Greg Whalen ("Whalen") witnessed Plaintiff ask for the form.  (*Id.* ¶ 76.)  However, Matos informed Plaintiff that it was "out of his hands" and that Weidel was on the way to see him.  (*Id.* ¶ 73 (alteration and quotation marks omitted).)  Plaintiff was deemed "[u]nwilling to [c]omply" with the order and placed on administrative leave 40 minutes later by Weidel, "who assumed that [Plaintiff] had no intention" of following the order to sign the HIPAA form.  (*Id.* ¶¶ 67, 74 (quotation marks omitted).)  Plaintiff alleges that he was the only officer in the Town ever required to sign a HIPAA release due to "an uncontested regular sick day."  (*Id.* ¶ 68.)

On December 16, 2015, Plaintiff was summoned to the Town's police headquarters and was "interrogated for nearly [eight] hours" by Hyman and Lt. Colbath.  (*Id.* ¶ 69.)  A stenographer, the "PBA president," and the "PBA attorney" were also present at the time, and the session was recorded.  (*Id.*)  Plaintiff had "no influential counsel representing him" during this process, and, according to Plaintiff, Hyman ignored the "many objections of the PBA Attorney" to questions that "prob[ed] as far back as . . . 2004 for answers . . . [that] would serve to facilitate the Town's aim of terminating [Plaintiff]."  (*Id.*)  Plaintiff was given another HIPAA release form at the end of the day and was told to sign, notarize, and return it within 24 hours, which Plaintiff did.  (*Id.*)  Plaintiff was again "interrogated" the following day.  (*Id.* ¶ 70.)

On March 11, 2016, Plaintiff received "disciplinary charges" which "relied heavily" on the "unlawful interrogation" that had taken place the previous December.  (*Id.* ¶ 71.)  On May 5, 2016, while Weidel was "in command," Plaintiff was approved for an award for "Excellent Police Service," despite being suspended at the time.  (*Id.* ¶ 65.)  However, Plaintiff did not

receive this award, which he alleges was due to "deeply rooted . . . hatred for [Plaintiff] due to his race, country of origin[,] and religion." (*Id.*)

On June 21, 2016, the first hearing related to Plaintiff's disciplinary charges took place, which was overseen by Hearing Officer William E. Sherwood ("Sherwood"). (*Id.* ¶ 72.)  During this hearing, Hyman explained that the doctor's notes Plaintiff submitted in support of an earlier sick day were "not acceptable" and that the Town ultimately ordered Plaintiff to sign, notarize, and return within 24 hours a HIPAA release form to gain access to Plaintiff's medical records. (*Id.* ¶¶ 72, 74 (quotation marks omitted).)  According to Plaintiff, Hyman had determined that Plaintiff's doctor's interpretations of the words "diagnosis" and "prognosis" were incorrect after consulting Wikipedia and also determined from "Wikipedia or Google" that the doctor's use of the acronym "N.B." "constitute[d] a threat" and "form[ed] what became the basis for one more charge against [Plaintiff]." (*Id.* ¶¶ 74, 76 (quotation marks omitted).)  Plaintiff alleges that the Town removed 50 pages of the transcript from the hearing, which included Hyman's responses, before submitting it to Sherwood, who pointed out that the pages had been removed.  (*Id.* ¶¶ 74–75.)  The page removal was not "properly mentioned or questioned" during the hearing, and Whalen, who witnessed Plaintiff "willingly request[]" the HIPAA form from Matos, was not interviewed.  (*Id.* ¶¶ 76–77.)  On December 15, 2016, Plaintiff was terminated from the Police Department, after the Town Council adopted the recommendations of the "hearing officers."  (*Id.* ¶ 75.)

On October 4, 2017, Plaintiff filed a complaint with the EEOC, alleging "unlawful discriminatory employment practices because of race/color, national origin, age, sex, and religion."  (*Id.* ¶ 25.)  On October 30, 2017, the EEOC "rendered a determination finding to

support the allegations of the October 4[,] 2017 [c]omplaint" and issued to Plaintiff a right-to-sue letter.  (*Id.* ¶¶ 25–26.)

Plaintiff alleges that during the course of his employment, he was "continually singled out by other employees and managers at the . . . Police Department . . . and subjected to a constant bombardment of discrimination and harassment because of his race/color, national origin[,] and religion."  (*Id.* ¶ 36.)  He also claims that he was "continually reprimanded," and regularly received less information and assistance than other officers, instead being "left to sink or swim and work[] under a continuous state of duress . . . knowing that, unlike his [w]hite counterparts, his employment with the Town . . . was never secured."  (*Id.* ¶ 64 (quotation marks omitted).)  For example, some junior officers received "cheat sheets" from supervisors related to more difficult aspects of their jobs.  (*Id.* (quotation marks omitted).)  Defendants "continually collect[ed] . . . proof" of a "pre-established . . . belief" that Plaintiff did not belong at the Police Department.  (*Id.*)  Plaintiff alleges that despite this "hostile environment," he remained in the top quarter of officers at the Police Department.  (*Id.*)  According to Plaintiff, "for years[,] he put supervisors and other officers on notice that he was being treated differently based on his race and ethnicity," but nothing was done "to assist him with protecting his employment rights."  (*Id.* ¶¶ 79–80.)  He also alleges that his termination was due to "retaliation and bias based on his race and ethnicity."  (*Id.* ¶ 78.)  Plaintiff seeks declaratory and injunctive relief, as well as damages, punitive damages, and attorneys' fees and costs.  (*Id.* at 22–23.)

### B.  Procedural Background

Plaintiff filed his original Complaint on January 26, 2018, at which point he was proceeding pro se.  (Dkt. No. 1.)  On March 19, 2018, Plaintiff filed an Amended Complaint.  (Dkt. No. 20.)  On April 3, 2018, Moving Defendants filed a pre-motion letter seeking to file a

motion to dismiss the Amended Complaint, and the Court scheduled a pre-motion conference.

(Dkt. Nos. 22–23.)  Prior to the conference, Plaintiff filed two applications for pro bono counsel,

which the Court denied without prejudice.  (Dkt. Nos. 27–29.)  On June 12, 2018, the Court held

the pre-motion conference and set a briefing schedule for Moving Defendants' Motion To

Dismiss the Amended Complaint.  (Dkt. (minute entry for June 12, 2018).)  After receiving leave

to file excess pages and an extension from the Court, (Dkt. Nos. 31, 36), Moving Defendants

filed their Motion To Dismiss the Amended Complaint on August 21, 2018, (Dkt. Nos. 33–35),

after which Plaintiff obtained counsel, (Dkt. Nos. 41–42).  Plaintiff filed a Response to the

Motion To Dismiss the Amended Complaint on November 2, 2018, (Dkt. No. 46), after

receiving an extension from the Court, (Dkt. No. 45).  Also after receiving an extension, (Dkt.

No. 48), Moving Defendants filed their Reply, (Dkt. No. 49).

On March 29, 2019, the Court issued an Order denying Moving Defendants' Motion To

Dismiss the Amended Complaint without prejudice to renew, given that Plaintiff asserted in his

Response that he had challenged his termination in an Article 78 proceeding that was pending in

New York.  (Order 1–2 (Dkt. No. 50).)  As such, the Court directed Plaintiff to clarify which

claims had been raised in the Article 78 proceeding.  (*Id.* at 2.)  The Court also noted that some

of Plaintiff's claims in the Amended Complaint had already been adjudicated and dismissed in

an action before the Honorable Cathy Seibel ("Judge Seibel") on June 25, 2015, except for

claims related to Plaintiff's termination.  (*Id.* at 1.)  Plaintiff filed his supplemental response to

this Order on April 12, 2019, to which Moving Defendants replied on May 8, 2019.  (Dkt. Nos.

51, 54.)  The Court held another pre-motion conference on May 15, 2019, after which Plaintiff

filed a Second Amended Complaint ("SAC") on June 17, 2019.  (*See* Dkt. (minute entry for May

15, 2019); Second Am. Compl. ("SAC") (Dkt. No. 57).)  On July 1, 2019, Moving Defendants

sought to file another motion to dismiss, (Dkt. No. 58), which Plaintiff opposed, (Dkt. Nos. 60, 62).  The Court scheduled a pre-motion conference for August 22, 2019, which was then rescheduled to September 10, 2019.  (Dkt. Nos. 63, 65.)  At the pre-motion conference, Plaintiff represented that he would file the TAC, which he did on October 9, 2019.  (*See* Dkt. (minute entry for September 10, 2019); TAC.)

On October 23, 2019, Moving Defendants once again sought to file a motion to dismiss, and the Court set a briefing schedule on October 30, 2019.  (Dkt. Nos. 68–69.)  After receiving an extension from the Court, (Dkt. No. 71), Moving Defendants filed the instant Motion on December 19, 2019.  (Not. of Mot.; Decl. of Vernée Pelage, Esq. in Supp. of Mot. ("Pelage Decl.") (Dkt. No. 73); Moving Defs.' Mem.)  After the Court granted his request for an extension, Plaintiff filed his Response on February 3, 2020.  (Pl.'s Mem. of Law in Opp'n to Mot. ("Pl.'s Mem.") (Dkt. No. 77).)  Moving Defendants filed a Reply on February 18, 2020.  (Moving Defs.' Reply Mem. of Law in Further Supp. of Mot. ("Moving Defs.' Reply Mem.") (Dkt. No. 78).)

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  "Nor does a complaint suffice if it

tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted).  Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering Moving Defendants' Motion, the Court is required to "accept as true all of the factual allegations contained in the [TAC]."  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (same).  And, the Court must "draw[] all reasonable inferences in favor of the plaintiff."  *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Intern. PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).

### B.  Analysis

Moving Defendants argue that many of Plaintiff's claims are time-barred, (Moving Defs.' Mem. 8–9); that Plaintiff failed to include his state law claims in his notice of claim, (*id.* at 9– 10); that Plaintiff fails to state a prima facie claim of retaliation, (*id.* at 10–12); that Plaintiff's claims are precluded by the findings at Plaintiff's disciplinary hearing, (*id.* at 12–14); and that, to the extent Plaintiff intends to raise them, he has failed to state claims of discrimination and hostile work environment, (*id.* at 14–18).  Moving Defendants also argue that many of the individual Defendants should be dismissed, that Plaintiff fails to allege that the remaining individual Defendants acted with retaliatory animus, and that, in any event, the individual Defendants are entitled to qualified immunity.  (*Id.* at 19–23.)  Finally, Moving Defendants argue that the Police Department cannot be sued, and that punitive damages are not available against a municipality.  (*Id.* at 23–24.)  The Court addresses each of these arguments to the extent necessary.

### 1.  Statutes of Limitations

#### a.  Title VII

Moving Defendants argue that any claims stemming from events that occurred prior to 300 days before Plaintiff's October 4, 2017 EEOC filing—thus, before December 8, 2016—are time-barred.  (*Id.* at 8.)  Plaintiff does not specifically dispute this argument, instead responding that "though some of the claims contained in his [TAC] . . . may be time[-]barred, the [TAC] still contains enough allegations that are not time[-]barred that clearly establish Plaintiff's retaliation claim."  (Pl.'s Mem. 9.)

"An aggrieved employee wishing to bring a Title VII claim in district court must file an administrative complaint with the EEOC within 300 days of the alleged discriminatory act."

*Petrosino v. Bell Atl.*, 385 F.3d 210, 219 (2d Cir. 2004) (citation omitted); *see also* 42 U.S.C. § 2000e-5(e) (same); *Sesay-Harrell v. N.Y.C. Dep't of Homeless Servs.*, No. 12-CV-925, 2013 WL 6244158, at *11 (S.D.N.Y. Dec. 2, 2013) (same).  While an exception to the statute of limitations exists where the plaintiff can establish a "continuing violation," the law in the Second Circuit is that "multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation."  *Sesay-Harrell*, 2013 WL 6244158, at *11 (emphasis, alteration, and quotation marks omitted) (quoting *Hongyan Lu v. Chase Inv. Serv. Corp.*, 412 F. App'x 413, 416 (2d Cir. 2011)).  Here, Plaintiff does not appear to argue that a continuing violation occurred, as he does not allege the existence of a "discriminatory policy or mechanism," *id.*, but instead alleges discrete acts, such as performance evaluations and disciplinary actions, occurring from 2002 until his termination in 2016.  (*See generally* TAC.)  Such occurrences are typically insufficient to establish a continuing violation. *See Moschetti v. N.Y.C. Dep't of Educ.*, No. 15-CV-3161, 2018 WL 4759787, at *12 (S.D.N.Y. Sept. 28, 2018) (finding that the plaintiff's discrimination claims related to performance reviews and a transfer were "discrete acts that accrued on the day that the events happened" (citation and quotation marks omitted)), *aff'd*, 778 F. App'x 65 (2d Cir. 2019); *Taylor v. City of New York*, 207 F. Supp. 3d 293, 307 (S.D.N.Y. 2016) ("As [the plaintiff's claims] concern discrete acts, the continuing violations doctrine does not apply under Title VII, § 1981, and NYSHRL." (citing *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997))); *Olivier v. County of Rockland*, No. 15-CV-8337, 2017 WL 934711, at *5 (S.D.N.Y. Mar. 8, 2017) ("Courts are . . . uniform in holding that disciplinary acts and negative evaluations . . . are 'discrete acts of discrimination' that do not suffice to invoke the continuing violation doctrine." (citation omitted)).

16

As such, alleged events that occurred prior to December 8, 2016—300 days before the filing of Plaintiff's complaint with the EEOC—are time-barred.  However, Plaintiff "has made a timely allegation of an adverse employment action—[his] termination on [December 15, 2016]—and the Court may consider [his] other allegations as 'background evidence' to determine whether that adverse action was the result of a discriminatory motive."  *Hagan v. City of New York*, 39 F. Supp. 3d 481, 496 n.10 (S.D.N.Y. 2014) (citation omitted); *see also Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 42 (2d Cir. 2019) ("[E]xpiration of the limitations period does not bar 'an employee from using the prior acts as background evidence in support of a timely claim.'" (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)); *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 176–77 (2d Cir. 2005) (noting that "relevant background evidence, such as statements by a decisionmaker or earlier decisions typifying the retaliation involved, may be considered to assess liability on the timely alleged act" when retaliation allegations extend beyond the limitations period (citation omitted)); *Moschetti*, 2018 WL 4759787, at *12 (finding that although several alleged events fell outside of the statute of limitations, those events could "still serve as background evidence of [the] [d]efendant's discriminatory motives in support of timely claims" (collecting cases)).  As such, the Court will consider Plaintiff's allegations outside of the limitations period as "context and support for the timely claims that Plaintiff asserts."  *Allen v. N.Y.C. Dep't of Envtl. Prot.*, 51 F. Supp. 3d 504, 510 n.2 (S.D.N.Y. 2014) (citation omitted).

### b.  42 U.S.C. § 1981

According to Moving Defendants, Plaintiff improperly brings retaliation claims against a municipality and state actors under 42 U.S.C. § 1981, which should be brought under 42 U.S.C. § 1983, and thus subject to a three-year statute of limitations.  (Moving Defs.' Mem. 8.)  Moving

Defendants therefore argue that Plaintiff's claims pre-dating January 28, 2015 are time-barred. (*Id.*)  Plaintiff does not dispute that his claims under § 1981 should be considered under § 1983, or that the three-year statute of limitations under § 1983 applies, instead arguing that at least some of his "42 U.S.C. § 1981/83 claims" survive because "Plaintiff has been discriminated against so much that even [if the] Court were to ignore the horrible actions and words that were spoken to him in the beginning of his career, there is still more than enough discrimination to allow this suit to continue."  (Pl.'s Mem. 9–10.)

The Court agrees that Plaintiff's § 1981 claims are properly construed under § 1983. "[Section] 1981 does not provide a separate private right of action against state actors," and § 1983 provides the "exclusive federal remedy" for such claims.  *Duplan v. City of New York*, 888 F.3d 612, 619, 621 (2d Cir. 2018) (emphasis omitted); *see also Gonzalez v. City of New York*, 377 F. Supp. 3d 273, 285 (S.D.N.Y. 2019) (finding that *Duplan* applies not only to claims against the municipality itself but also against individual municipal defendants).  As such, the Court considers Plaintiff's retaliation claims under § 1983.

Generally, employment discrimination and retaliation claims brought under § 1981 are subject to a four-year statute of limitations.  *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004); *Staten v. Village of Monticello*, No. 14-CV-4766, 2016 WL 7235796, at *4 n.6 (S.D.N.Y. Dec. 13, 2016) (noting that "if a claim under § 1981 was made possible by the 1991 amendments to § 1981, which extended the statute to include claims of discrimination in the conditions of employment, the claim is governed by the four-year statute of limitations set forth in 28 U.S.C. § 1658(a)" (citation and quotation marks omitted)); *Vaughn v. City of New York*, No. 06-CV-6547, 2010 WL 2076926, at *7 (E.D.N.Y. May 24, 2010) ("Discrimination and retaliation claims under § 1981 are governed by the general four year statute of limitations found

in 28 U.S.C. § 1658." (citation omitted)).  However, claims brought pursuant to § 1983 in New

York are subject to a three-year statute of limitations.  *See Hogan v. Fischer*, 738 F.3d 509, 517

(2d Cir. 2013) (finding that § 1983 actions filed in New York are subject to a three-year statute

of limitations).  While some courts have applied a four-year statute of limitations to actions

alleging violations of § 1981 by state actors through § 1983, others have applied § 1983's three-

year statute of limitations.  *See Sosa v. New York City Dep't of Educ.*, 368 F. Supp. 3d 489, 509

n.12 (E.D.N.Y. 2019) (collecting cases).  Here, the Court agrees with Moving Defendants that

"[u]ltimately, because Plaintiff[] ha[s] brought [his] [§] 1981 claims pursuant to [§] 1983, the

claims are subject to [§] 1983's three-year statute of limitations rather than [§] 1981's more

variable limitations period."  *Richardson v. City of New York*, No. 17-CV-9447, 2018 WL

4682224, at *12 (S.D.N.Y. Sept. 28, 2018) (citations omitted); *see also City of Rancho Palos

Verdes v. Abrams*, 544 U.S. 113, 124–25 (2005) (explaining that § 1983's statute of limitations

does not depend on which underlying right the action is brought to enforce); *Duplan*, 888 F.3d at

619–21 (finding that § 1983 provides the exclusive federal remedy against state actors for

violation of rights guaranteed by § 1981, and therefore rejecting the plaintiff's attempts to bring a

claim against state actors under § 1981 in order to benefit from the longer statute of limitations).

Accordingly, all of Plaintiff's claims of discrete acts of retaliation and discrimination brought

pursuant to § 1983 that occurred prior to January 28, 2015 are time-barred.  However, as stated,

to the extent these allegations provide "context and support for the timely claims that Plaintiff

asserts," the Court will consider them.  *Allen*, 51 F. Supp. 3d at 510 n.2.

## 2.  Preclusive Effect of Disciplinary Hearing

Moving Defendants argue that the findings at Plaintiff's disciplinary hearing "preclude

Plaintiff from arguing [that] the disciplinary charges or his termination were unjustified."

(Moving Defs.' Mem. 12–14.)  Plaintiff disagrees, responding that the disciplinary findings were unrelated to his allegations of retaliation and thus should not preclude his claims in this Action. (Pl.'s Mem. 12.)

"It is well settled that federal courts must give state-court judgments the same preclusive effect as they would receive in courts of the same states," *Garcia v. Yonkers Bd. of Educ.*, No. 15-CV-767, 2018 WL 4007648, at *5 (S.D.N.Y. Aug. 21, 2018) (quotation marks omitted) (quoting *Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 310 (2d Cir. 2005)), *aff'd*, 803 F. App'x 441 (2d Cir. 2020), and that state administrative proceedings are entitled to "preclusive effect where there has been a full and fair opportunity to litigate," *Burkybile*, 411 F.3d at 310.  However, although certain facts determined by the hearing officer may ultimately have a preclusive effect, Plaintiff is correct that the hearing officer's legal conclusions in support of his termination do not preclude his claims in this Action.  *See Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 49 (2d Cir. 2014) (concluding that an administrative law judge's legal conclusions did not preclude a discrimination claim because the conclusions "were guided by the particular legal framework and standards applicable" to the administrative hearings).  Specifically, it appears from Sherwood's decision that Plaintiff did not raise retaliatory animus during these proceedings.  (*See* Pelage Decl. Ex. B ("Sherwood Decision") (Dkt. No. 73-2).)  Sherwood instead recommended Plaintiff's termination on the basis of alleged misconduct, and did not determine whether the disciplinary charges brought against Plaintiff were for a retaliatory purpose.  (*Id.*)  Accordingly, collateral estoppel does not apply merely because Sherwood decided that the Police Department had sufficient cause to fire Plaintiff.  *See Vargas v. City of New York*, 377 F.3d 200, 206 (2d Cir. 2004) (holding that findings from an administrative hearing and an Article 78 proceeding that the plaintiff engaged in misconduct and

should be terminated did not necessarily preclude the issue of whether the termination was made with discriminatory intent); *Yarrington v. Candor Cent. Sch. Dist.*, No. 18-CV-1250, 2020 WL 1493920, at *5–6 (N.D.N.Y. Mar. 27, 2020) (finding that because a hearing officer at a Section 75 proceeding did not consider whether the plaintiff was terminated because of retaliation or discrimination, the plaintiff was not precluded from bringing such claims); *Tyson v. Town of Ramapo*, No. 17-CV-4990, 2019 WL 1331913, at *10 (S.D.N.Y. Mar. 25, 2019) ("Because [the] [p]laintiff did not raise her discrimination claims in the state proceeding, and because there is no other indication that the state court considered and rejected these claims, collateral estoppel does not preclude [the] [p]laintiff from making a discrimination challenge in the instant case."); *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 472 (S.D.N.Y. 2011) ("[A] finding that [the] [p]laintiff was terminated for cause does not bar [the] [p]laintiff's Title VII claim.  Even if [the] [p]laintiff cannot dispute the factual findings of the [h]earing [o]fficer's decision, [the] [p]laintiff can still prevail if he shows that [the] [d]efendants acted with an improper motive in bringing charges against [the] [p]laintiff."); *Morey v. Somers*, No. 06-CV-1877, 2007 WL 867203, at *5 (S.D.N.Y. Mar. 21, 2007) (finding the same when "the record of the administrative hearing [was] devoid of any evidence that the issue of retaliation was actually litigated and necessarily decided" and when "neither the hearing officer nor the Article 78 court addressed the issue of retaliation"); *Levich v. Liberty Cent. Sch. Dist.*, 361 F. Supp. 2d 151, 157 n.6 (S.D.N.Y. 2004) ("Collateral estoppel is not applicable to [the] plaintiff's claim that the change in the conditions of his employment were made in retaliation for his criticism of the [s]chool [d]istrict's administration[,] as that issue was not raised in the prior § 3020-a proceeding").

Further, for the purposes of the present Motion, the Court declines to consider the transcript of the disciplinary hearing submitted by Moving Defendants.  (*See* Pelage Decl. Ex. C

("Tr. A"); *id.* Ex. D ("Tr. B") (Dkt. Nos. 73-3–73-6).)  Although Plaintiff references certain comments made during the hearing in the TAC, (TAC ¶¶ 74, 76), "these limited references do not justify this Court incorporating the rest of the transcript into the [TAC]."  *Agostino v. Simpson*, No. 08-CV-5760, 2008 WL 4906140, at *3 (S.D.N.Y. Nov. 17, 2008) (citation omitted); *see also Sira v. Morton*, 380 F.3d 57, 67–68 (2d Cir. 2004) (determining that the district court would need to convert a motion to dismiss to a motion for summary judgment to consider a hearing transcript because the complaint did not cite the transcript, it was not integral to the plaintiff's claims, and the complaint included only one quotation from the transcript).  Moreover, even if the Court did take judicial notice of this transcript, it would not consider it for the truth of the matters asserted therein.  *See Agostino*, 2008 WL 4906140, at *3 (determining that even when a court can take judicial notice of a testimony transcript, it may only do so on a motion to dismiss "to establish the existence of the [document], not for the truth of the facts asserted in the [document]" (alteration in original) (citations omitted)); *see also Guo v. IBM 401(k) Plus Plan*, 95 F. Supp. 3d 512, 522 (S.D.N.Y. 2015) (declining to consider a transcript from an earlier hearing before the court because the plaintiff did not "rely on the [t]ranscript in crafting the [c]omplaint").  Accordingly, the Court will not consider the hearing transcript in deciding the instant Motion.[4]

---

[4] Similarly, the Court will not consider a March 12, 2012 e-mail filed by Moving Defendants with their Motion.  (Pelage Decl. Ex. A ("March 2012 E-Mail") (Dkt. No. 73-1).)  Moving Defendants represent that this message is referenced in the TAC and relates to the alleged deletion of traffic tickets issued by Plaintiff.  (Moving Defs.' Mem. 4 & n.3.)  However, it is unclear from the TAC whether Plaintiff actually references this e-mail, as he states that he complained "in a written memo," (TAC ¶ 60), and, in any event, Plaintiff's limited reference to his message does not necessarily incorporate it into the TAC.  *See Sira*, 380 F.3d at 67 ("Limited quotation or reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents, wholesale, into the complaint.").  The Court will not consider this document.

### 3.  Retaliation Claims

Moving Defendants argue that Plaintiff has not established that retaliation was the "but for" cause of his termination, and that the majority of Plaintiff's allegations of retaliation are conclusory.  (Moving Defs.' Mem. 10–12.)  Moving Defendants also argue that Plaintiff has not established temporal proximity between the alleged protected actions and his termination.  (*Id.* at 11–12.)

At the outset, the Court notes that individual defendants cannot be held liable under Title VII.  *See Davis Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 687 (S.D.N.Y. 2012) ("It is well settled that there is no individual liability under Title VII." (citing *Lore v. City of Syracuse*, 670 F.3d 127, 169 (2d Cir. 2012))); *see also Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004) (noting that "individuals are not subject to liability under Title VII," including "individual defendants with supervisory control over a plaintiff" (citations and quotation marks omitted)).  Accordingly, to the extent Plaintiff intends to bring retaliation claims against individual Defendants under Title VII in his TAC, these claims are dismissed with prejudice.[5]

Title VII's anti-retaliation provision prohibits an employer from "discriminat[ing] against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter."  42 U.S.C. § 2000e-3(a).  In other words, "Title VII forbids an employer to retaliate against an employee for . . . complaining of employment discrimination prohibited by Title VII."  *Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461

---

[5] This is not the first time that Plaintiff has received this instruction.  In an earlier Action pending before Judge Seibel, Plaintiff's Title VII claims against individual defendants were similarly dismissed, and although Judge Seibel noted that she "need not consider whether this [wa]s sanctionable conduct," she "caution[ed] Plaintiff's counsel not to [bring Title VII claims against individual defendants] again[,] or sanctions may well become an issue."  (Decl. of Steven C. Stern, Esq. in Supp. of Motion To Dismiss Pl.'s Am. Compl. Ex. F ("Seibel Tr."), at 10–11 (Dkt. No. 34-6).)

F.3d 199, 205 (2d Cir. 2006).  Thus, "for a retaliation claim to survive . . . a motion to dismiss, the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against him, (2) 'because' he has opposed any unlawful employment practice."  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) (citation omitted).  "A plaintiff's burden at this prima facie stage is de minimis."  *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation and italics omitted).  Retaliation claims under § 1983 and the NYSHRL are subject to the same burden-shifting framework.  *See Goonewardena v. N.Y. Workers Comp. Bd.*, 258 F. Supp. 3d 326, 343–44 (S.D.N.Y. 2017) (treating retaliation claims under Title VII, § 1983, and the NYSHRL under the same burden-shifting framework), *aff'd*, 788 F. App'x 779 (2d Cir. 2019).  The Court therefore evaluates the substance of each of Plaintiff's retaliation claims congruently.

With respect to protected activity, Plaintiff does not point to one action in particular, instead arguing that "[t]here is actually no one event that can be used . . . as the triggering event," and that "[t]he event could as easily be a write [sic] as it could be the filing of a[n] EEOC claim or a refusal to sign a [HIPAA] release form."  (Pl.'s Mem. 12.)  However, in order to state a claim for retaliation, Plaintiff must allege that he engaged in a "protected activity," which "refers to action taken to protest or oppose statutorily prohibited discrimination."  *Soto v. Marist Coll.*, No. 17-CV-7976, 2019 WL 2371713, at *10 (S.D.N.Y. June 5, 2019) (citation and quotation marks omitted).  "The opposition must be directed at an unlawful employment practice of an employer," *Wimmer v. Suffolk Cty. Police Dep't*, 176 F.3d 125, 135 (2d Cir. 1999) (citation and quotation marks omitted), and "even an informal protest of discriminatory employment practices" will suffice, *Mejia v. White Plains Self Storage Corp.*, No. 18-CV-12189, 2020 WL

247995, at *6 (S.D.N.Y. Jan. 16, 2020) (emphasis and quotation marks omitted) (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)).

Here, Plaintiff alleges that he engaged in several such activities, including reporting a racially discriminatory comment by Corbett to his supervisor in December 2004, (TAC ¶ 39); filing a grievance in September 2008 related to alleged religious discrimination, (*id.* ¶ 55); filing an EEOC complaint in 2009 containing various allegations of discrimination, including Corbett's comment, (*id.* ¶ 56); and filing another EEOC complaint in 2017 related to his termination, (*id.* ¶ 25). Thus, the Court construes the TAC as alleging that the 2004 and 2008 reports, along with the 2009 EEOC Complaint, are the activities for which Defendants retaliated against Plaintiff.[6] Other, more general allegations raised by Plaintiff that "for years[,] he put supervisors and other officers on notice that he was being treated differently based on his race and ethnicity," (*id.*

---

[6] Although Plaintiff alleges that he made other reports of misconduct, such as being "berated" for issuing a routine ticket to Franklin's friend, (TAC ¶ 49), and "complain[ing]" about his "heavy workload" in 2007, (*id.* ¶ 51), Plaintiff does not indicate that these objections were related to "statutorily prohibited discrimination," and, as such, they do not constitute protected activities for the purpose of Plaintiff's retaliation claims. *See Mejia*, 2020 WL 247995, at *6 (dismissing a retaliation claim when the plaintiff alleged that he complained when the defendant was not honoring his request not to work on Sundays, but did not allege that he mentioned to his supervisors that his religion required him to take the day off); *Aspilaire v. Wyeth Pharms., Inc.*, 612 F. Supp. 2d 289, 308–09 (S.D.N.Y. 2009) ("[M]ere complaints of unfair treatment by an individual are not protected speech because unfair treatment by an employer does not implicate a public interest concern." (citation omitted)). Further, with respect to HIPAA releases given to Plaintiff, nowhere in the TAC does Plaintiff allege that he refused to sign these forms. Instead, he alleges that on December 1, 2015, he "accept[ed] the written order" to sign a HIPAA form, which "implie[d] the willingness to comply with it," and on December 16, 2015, he signed a HIPAA release form, (TAC ¶¶ 67, 69).

Moreover, the Court cannot consider the 2017 EEOC complaint as a protected activity for the purpose of Plaintiff's retaliation claims because Plaintiff's termination took place *before* this complaint was filed. *See Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the [p]laintiff had ever engaged in any protected activity, an inference of retaliation does not arise.").

¶ 79), are conclusory, and without further details, the Court will not consider them. *See Henry v. N.Y.C. Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 412 (S.D.N.Y. 2014) (dismissing a retaliation claim where the complaint "fails to state with even a modicum of specificity when the relevant events occurred"). Similarly, although Plaintiff does not specifically name an action by Defendants as the "adverse action" upon which he bases his retaliation claims, in his Opposition, Plaintiff states that the adverse employment action he focuses on is his termination. (Pl.'s Mem. 14.)[7]

With respect to the causation element for a claim of retaliation, "a plaintiff must plausibly plead a connection between the act and his engagement in protected activity." *Vega*, 801 F.3d at

---

[7] Plaintiff previously brought a case before Judge Seibel related to his attempt to observe a religious holiday, claiming, as he has here, that a white female police officer was allowed to operate on a modified work schedule to accommodate her religious beliefs, but that Plaintiff was written up for doing so. (*See* Am. Compl. (Dkt. No. 11, *Tenemille v. Ramapo Police Department*, Case No. 14-CV-4660).) Judge Seibel construed Plaintiff's protected activity to be the filing of his 2009 EEOC complaint and the alleged adverse actions to be either the adoption of a religious leave policy or Plaintiff's suspension from March 2012 to February 2013, neither of which Plaintiff mentions in the TAC. (Seibel Tr. 8–9.) Judge Seibel ruled that the adoption of the religious leave policy was time-barred, the three-year gap between the 2009 EEOC complaint and Plaintiff's 2012 suspension was too lengthy to raise an inference of causation, and Plaintiff failed to allege that any comparators were similarly situated. (*Id.* at 11–12.) Judge Seibel ultimately granted the defendants' motion to dismiss and dismissed the case. (Dkt. No. 25, *Tenemille v. Ramapo Police Department*, Case No. 14-CV-4660.)

Conversely, here, Plaintiff appears to allege that the adverse action was his 2016 termination, and the issues with his desired religious observance were part of a pattern of retaliation leading up to his termination. (*See* Pl.'s Mem. 14 ("[Plaintiff] suffered an adverse employment action (he was fired) . . . . [a]nd . . . the discrimination never stopped until he was terminated.").) Further, when Plaintiff filed the action before Judge Seibel, he had not yet been terminated. As such, because Plaintiff's claim is not identical to that brought before Judge Seibel, and because Plaintiff's termination could not have been litigated at that point, the Court does consider Plaintiff's allegations regarding the 2008 grievance and 2009 EEOC complaint. *See Leather v. Eyck*, 180 F.3d 420, 424 (2d Cir. 1999) ("Under the doctrine of claim preclusion, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." (quotation marks omitted)). However, the Court finds Judge Seibel's previous determination to be highly relevant in deciding this Motion.

90.   A plaintiff can demonstrate the causal connection in one of two ways: "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000); *see also Rodriguez v. Town of Ramapo*, 412 F. Supp. 3d 412, 443 (S.D.N.Y. 2019) (same).  Here, Plaintiff does not specifically "tie [his termination] to the reporting of any act of discrimination." *Grimes-Jenkins v. Consol. Edison Co. of New York, Inc.*, No. 16-CV-4897, 2017 WL 2258374, at *11 (S.D.N.Y. May 22, 2017), *adopted by* 2017 WL 2709747 (S.D.N.Y. June 22, 2017). Instead, Plaintiff alleges only that "[w]hen [Plaintiff] complained of the discriminatory and harassing conduct committed against him by his supervisors and co-workers, the . . . Police Department retaliated against him by bringing unfounded disciplinary charges and terminating his employment."  (TAC ¶ 33.)  However, Plaintiff does not allege any facts to plausibly suggest that his aforementioned protected activities motivated this termination, such as "negative comments by supervisors" about his complaints, *Gelin v. Geithner*, No. 06-CV-10176, 2009 WL 804144, at *22 (S.D.N.Y. Mar. 26, 2009), *aff'd*, 376 F. App'x 127 (2d Cir. 2010), or "an admission by the decisionmaker that he . . . made a decision by relying on an improper consideration," *Farmer v. Shake Shack Enters., LLC*, No. 19-CV-9425, 2020 WL 4194860, at *13 (S.D.N.Y. July 21, 2020) (citation and quotation marks omitted).  (*See generally* TAC.)  The Court therefore considers whether Plaintiff has indirectly alleged a causal connection.

Moving Defendants argue, inter alia, that the alleged protected activities and adverse event did not occur close enough in time to raise an inference of retaliation.  (Moving Defs.' Mem. 11–12.)  Although the Second Circuit "ha[s] not drawn a bright line to define the outer

limits beyond which a temporal relationship is too attenuated to establish a causal relationship between [a protected activity] and an allegedly retaliatory activity," *Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013) (quotation marks omitted), the temporal proximity must be "very close," and a lapse of as much as "20 months . . . suggests, by itself, no causality at all," *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (quotation marks omitted); *see also Harper v. Brooklyn Children's Ctr.*, No. 12-CV-4545, 2014 WL 1154056, at *5 (E.D.N.Y. Mar. 20, 2014) ("[T]he approximately two years between [the] plaintiff's 2007 federal action and [the] defendant's alleged retaliation in 2009 do not support an inference of retaliation because they lack temporal proximity." (quotation marks omitted)).  As such, when considering temporal proximity alone, Plaintiff's 2016 termination is beyond the "outer limit of the amount of time that is considered sufficient to establish causation." *Cronin v. St. Lawrence*, No. 08-CV-6346, 2009 WL 2391861, at *5 (S.D.N.Y. Aug. 5, 2009) (finding that the passage of eleven months was at this "outer limit") (citations omitted); *see also Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 131 (2d Cir. 2012) (noting that courts "typically measure[] th[e] gap [between a protected activity and alleged retaliation] as a matter of months, not years" (citation omitted)); *Saenger v. Monte*, 706 F. Supp. 2d 494, 520 (S.D.N.Y. 2010) (finding that the passage of a year between the plaintiff's age discrimination complaint and his termination was "outside the normal zone of tolerable temporal proximity" (collecting cases)); *Tori v. Marist Coll.*, No. 06-CV-419, 2008 WL 11451434, at *13 (S.D.N.Y. Sept. 11, 2008) (granting a motion for summary judgment when the gap between the protected activity and denial of tenure was more than five years); *Nicastro v. Runyon*, 60 F. Supp. 2d 181, 185 (S.D.N.Y. 1999) ("Claims of retaliation are routinely dismissed when as few as three months elapse between the protected . . .

activity and the alleged act of retaliation.  Surely, two-and-one half years is far too long to warrant an inference of discriminatory retaliation." (citations omitted)).

Additionally, at least one of Plaintiff's allegations of antagonism—the questioning of his service in the Navy—took place at least two years *before* Plaintiff's report of Corbett's statement, his first protected act, and many more of the alleged incidents took place in the years leading up to his October 2008 grievance and 2009 EEOC complaint.  (*See* TAC ¶¶ 34–36 (incident related to investigation of Plaintiff's Naval service), 40–54 (events prior to Plaintiff's 2008 grievance and 2009 EEOC complaint).)  As such, "the requisite causal connection . . . falter[s]" because the "complained-of conduct began before [Plaintiff's] corresponding protected activity."  *Wang v. Palmisano*, 157 F. Supp. 3d 306, 327 (S.D.N.Y. 2016) (collecting cases); *see also Dabney v. Christmas Tree Shops*, 958 F. Supp. 2d 439, 456 (S.D.N.Y. 2013) ("Although temporal proximity can sometimes demonstrate a causal nexus, where . . . the termination was ultimately the product of an extensive period of progressive discipline that began when [the] [p]laintiff received h[is] first written warning . . . months before [the employer learned of the alleged protected activity], a claim for retaliation cannot be maintained."  (quotation marks omitted)), *aff'd sub nom. Dabney v. Bed Bath & Beyond*, 588 F. App'x 15 (2d Cir. 2014); *White v. Eastman Kodak*, No. 06-CV-6493, 2009 WL 1514659, at *10 (W.D.N.Y. May 29, 2009) ("[W]here . . . discipline was already underway prior to the protected activity . . . , the Second Circuit has held that temporal proximity alone is insufficient to make out a prima facie case."), *aff'd*, 368 F. App'x 200 (2d Cir. 2010).

However, Plaintiff argues that he relies not only on temporal proximity, but also on the fact that "the civil rights violations never stopped" until his termination.  (Pl.'s Mem. 12, 14.) Plaintiff thus appears to allege that his termination occurred "against a backdrop of continuing

antagonism and frustration of [Plaintiff's] professional ambitions," which, in some cases, can "establish a drumbeat of retaliatory animus from which a plausible inference of causation can be drawn." *Duplan*, 888 F.3d at 626. Indeed, "[t]emporal gaps that are too long to give rise to an inference of causation may be bridged by an intervening pattern of retaliatory treatment." *Burgos v. City of New York*, No. 18-CV-1150, 2019 WL 1299461, at *10 (S.D.N.Y. Mar. 21, 2019) (citation and quotation marks omitted); *see also Chan v. NYU Downtown Hosp.*, No. 03-CV-3003, 2004 WL 213024, at *3 (S.D.N.Y. Feb. 3, 2004) ("Even though an alleged act of retaliation may be separated by a significant gap in time from the date on which a complaint of discrimination was made, evidence of an intervening pattern of antagonism . . . could support an inference that an alleged retaliatory act . . . was causally related to [a] complaint of discrimination." (citation omitted)). Where such a pattern exists, "the court will find but-for causation even if there might be another motivating factor." *Butts v. N.Y.C. Dep't of Educ.*, No. 16-CV-5504, 2018 WL 4725263, at *13 (E.D.N.Y. Sept. 28, 2018) (citation omitted).

The Court finds that Plaintiff has not pled facts that plausibly establish a "backdrop of continuing antagonism," *Duplan*, 888 F.3d at 626, that would support an inference of causation. First, Plaintiff fails to provide specific dates for many of the events detailed in the TAC. For example, he alleges that in December 2004, Corbett stated that "they [African-Americans] only have [two-fifths] of a brain anyway," which Plaintiff reported to his supervisor. (TAC ¶ 38 (first alteration in original) (quotation marks omitted).) Plaintiff thereafter claims that actions were taken against him for his handwriting, he was "constantly under-evaluated," and his "positive accomplishments" were ignored in a "concerted effort to bolster the . . . Police Department's aim of terminating him." (*Id.* ¶¶ 40–44.) However, Plaintiff either makes vague statements about when these events occurred, (*id.* ¶ 42 ("Not long after the report incident with . . . Corbett . . .")),

or does not clarify whether the events occurred before or after he reported Corbett's statement, (*id.* ¶ 46 (alleging that "in 2004," he was recommended for termination and was given an unsatisfactory evaluation)), making it impossible for the Court to determine whether a "pattern of retaliatory conduct beg[a]n[] *soon after* the protected conduct," *Krause v. Eihab Human Servs., Inc.*, No. 10-CV-898, 2015 WL 4645210, at *11 (E.D.N.Y. Aug. 4, 2015) (emphasis added) (citation, alterations, and quotation marks omitted)).  A series of Plaintiff's later allegations are similarly unclear as to the timeline, and are thus "too vague in nature and non-specific as to time to serve as a basis" for Plaintiff's retaliation claims.  *Winston v. City of New York*, No. 12-CV-395, 2013 WL 4516097, at *4 (E.D.N.Y. Aug. 23, 2013).  (*See* TAC ¶ 52 (noting that Plaintiff was "later transferred to another sector"), ¶ 62 (stating that an incident generally "generated a wave of discriminatory and retaliatory backlash"), ¶ 64 (claiming that "[Plaintiff] was continually reprimanded").)  *See also Ward v. Shaddock*, No. 14-CV-7660, 2016 WL 4371752, at *13 (S.D.N.Y. Aug. 11, 2016) (finding that the plaintiff failed to state a claim for retaliation when the plaintiff made "generalized reference" to the dates of relevant events); *Wang*, 51 F. Supp. 3d at 541 (dismissing retaliation claim where the plaintiff "alleged the dates on which he filed his complaints" but "merely allege[d]" that the retaliation occurred "'after' he filed his complaints" (record citation omitted)); *Henry*, 18 F. Supp. 3d at 412–13 (dismissing retaliation claims when the plaintiff "fail[ed] to state with even a modicum of specificity when the relevant events occurred").

Second, many of the events alleged by Plaintiff do not appear to rise to the level of adverse actions.  Although Plaintiff does claim that he received one "unsatisfactory" evaluation in 2004, (TAC ¶ 46), and "low marks" on a later evaluation, (*id.* ¶ 54), he also alleges that in 2014, he was rated as "[a]verage" for the year, even though he had achieved the fourth largest

number of arrests, stopped a suicide, and was recommended for an award that he did not receive, (*id.* ¶ 63). While negative performance evaluations can constitute adverse employment actions, *see, e.g.*, *Vega*, 801 F.3d at 91–92, a positive, or "less-than-perfect" review, such as an "average" rating, is distinguishable, *Pistello v. Bd. of Educ. of Canastota Cent. Sch. Dist.*, No. 16-CV-212, 2019 WL 1300947, at *14 (Mar. 21, 2019) (collecting cases), *overturned on other grounds*, 808 F. App'x 19 (2d Cir. 2020); *see also Moy v. Perez*, 712 F. App'x 38, 41 (2d Cir. 2017) (holding that a positive performance evaluation, even if less positive than those received in previous years, cannot "plausibly make out an adverse employment action" in the retaliation context); *Byrne v. Telesector Res. Grp., Inc.*, 339 F. App'x 13, 17 (2d Cir. 2009) (determining that because a satisfactory performance evaluation was still positive, it was not an adverse employment action in the context of Title VII retaliation claims).

Similarly, with respect to Plaintiff's sick leaves, at least one of his allegations seems to suggest only that a leave was more closely scrutinized, which also does not constitute an adverse event. (*Id.* ¶¶ 69, 72 (noting that Plaintiff was directed to sign a "HIPAA release form" after Defendants attempted to examine his "medical dossier" to substantiate doctor's notes submitted by Plaintiff after taking a sick day, and that he was "interrogated" regarding events dating back to 2004).) *See Cody v. County of Nassau*, 577 F. Supp. 2d 623, 645–46 (E.D.N.Y. 2008) (finding that requiring the plaintiff to provide documentation from a physician whenever she used a sick day and allegedly falsely accusing the plaintiff of being absent without authorization were not adverse actions), *aff'd*, 345 F. App'x 717 (2d Cir. 2009); *Lee v. Verizon Wireless, Inc.*, No. 07-CV-532, 2008 WL 4479410, at *7 (D. Conn. Sept. 26, 2008) ("[Q]uestioning by supervisors . . . and oral or written warnings based on documented company policy violations are not materially adverse actions in the view of a reasonable employee and constitute, at best, trivial

harms which are not actionable." (quotation marks omitted)); *Blake v. Potter*, No. 03-CV-7733, 2007 WL 2815637, at *9 (S.D.N.Y. Sept. 24, 2007) (finding that "being asked to bring in a doctor's note to substantiate a request for sick leave . . . or being given a . . . letter of warning for failure to do so" did not constitute adverse employment action).   Plaintiff also details several instances where he was unfairly "berated" or "reprimanded" by other officers, which similarly would not constitute an adverse action to the extent that there were not other negative results, such as a demotion or decrease in pay.  (TAC ¶¶ 49, 64.)  *See Lucenti v. Potter*, 432 F. Supp. 2d 347, 364 (S.D.N.Y. 2006) ("Reprimands, threats of disciplinary action, and excessive scrutiny do not constitute adverse employment actions."); *Nix v. Cino*, No. 02-CV-4609, 2006 WL 2711625, at *5 (E.D.N.Y. Sept. 21, 2006) ("Mere reprimands or threats of disciplinary action, absent any other negative results, such as a decrease in pay, do not qualify as adverse employment actions.").  Plaintiff also fails to allege that the officers involved in these issues were aware of or involved in handling his alleged protected reports.  (*See generally* TAC ¶¶ 39 (stating that Plaintiff "complained of [discriminatory comments] to his supervisors"), 55 (noting that Plaintiff filed a grievance, without further details on the handling of this grievance), 56 (stating that in 2009, Plaintiff filed an EEOC report).)

Plaintiff further admits that some of the instances of alleged retaliatory conduct detailed in his TAC were resolved.  For example, Plaintiff alleges that in May 2010, when he filed a police report about his au pair taking his keys, the issue was improperly investigated *until* he complained to his supervisor.  (TAC ¶ 58; *see also id.* ¶ 63 (explaining that Plaintiff's 2014 evaluation did not mention his halting of a suicide attempt "until after [Plaintiff] protested").)  The Court is therefore not persuaded that such instances help to establish a pattern of continuous antagonism.  Finally, Plaintiff's allegations that he was "subjected to a constant bombardment of

discrimination and harassment because of his race/color, national origin, and religion," (*id.* ¶ 36), and that after putting a bumper sticker in support of Obama on his car, he suffered "a wave of discriminatory and retaliatory backlash," (*id.* ¶ 66), without more, are conclusory and do not establish an inference of causation.

Most glaringly, even if the Court were to consider all of the events alleged by Plaintiff from the time of his first complaint in 2004 to his termination in 2016, the length of time between these alleged acts is too protracted to plausibly suggest that a "backdrop of continuing antagonism" existed. *Duplan*, 888 F.3d at 626. Plaintiff alleges a series of actions by members of the Police Department over the course of 14 years, stretching from 2002 until his termination in 2016. (*See generally* TAC.) In many cases, one, or fewer than one, of these acts occurred each year. (*See id.* ¶¶ 37–75 (alleging multiple events in 2004, one event in each of 2005 and 2006, two events in 2007, one event in 2008, two events in 2010, one event in each of 2012, 2013, and 2014, and several events in 2015 and 2016 leading up to Plaintiff's termination).) The alleged acts are sporadic at best, and do not demonstrate "an[] ongoing pattern of adverse actions that might link the [protected complaints] to [Plaintiff's 2016 termination]." *Malgeri v. Ehrenberg*, No. 12-CV-2517, 2012 WL 6647515, at *7 (S.D.N.Y. Dec. 21, 2012). Indeed, the Second Circuit and district courts within it have found such a pattern to exist when alleged acts of antagonism occur with more regularity and often over a shorter period of time. *See Duplan*, 888 F.3d at 626 (finding that following complaints of discrimination by plaintiff in 2011, "his supervisors collectively and persistently discouraged him from remaining at the [workplace] by ostracizing him, giving him insufficient work, and making clear to him that his career would not advance further by denying him every promotion and raise" over the course of three years); *Jute*, 420 F.3d at 170 (finding that the plaintiff suffered "numerous other retaliatory acts" over the

course of two years, in the lead up to his termination); *Chabot v. County of Rockland*, No. 18-CV-4109, 2019 WL 3338319, at *7 (S.D.N.Y. July 25, 2019) (concluding that the plaintiff alleged a course of antagonistic conduct over the course of 17 months when he pointed to criticisms regularly made about his protected speech and activities and threatening his employment); *Burgos*, 2019 WL 1299461, at *10 (determining that the plaintiff sufficiently pled the existence of a pattern of antagonism when he engaged in four instances of protected activity over the course of two years and, over the same period, received eight disciplinary complaints, two unsatisfactory performance reviews, denial of a promotion, and multiple disciplinary complaints); *Goode v. Donahue*, No. 12-CV-3982, 2015 WL 6680227, at *2, *5–*6 (E.D.N.Y. Nov. 2, 2015) (noting that between a 2006 complaint and a 2009 termination, the plaintiff was followed on her work route every day to "lay the foundation for her termination," endured comments about her race every other day, and received seven disciplinary notices and suspensions over the course of two years); *Stokes v. City of Mount Vernon*, No. 11-CV-7675, 2012 WL 3536461, at *8 (S.D.N.Y. Aug. 14, 2012) (finding that plaintiff's allegations adequately supported an inference of a causal connection between the plaintiff's protected speech and his constructive discharge when the defendants allegedly engaged in acts of a "continuing nature . . . , commencing shortly after plaintiff's [protected act]").  Nor has Plaintiff suggested that his termination in 2016 was Defendants' first opportunity to take adverse action against him, or that Defendants explicitly indicated to him that his protected speech could affect him in the future.  *Cf. Mandell v. County of Suffolk*, 316 F.3d 368, 384 (2d Cir. 2003) (finding that a protracted period of time between the protected speech and the adverse action did not preclude an inference of causation when the plaintiff's supervisor allegedly warned him of "baggage" from his protected speech); *Bucalo*, 691 F.3d at 131 (noting that a retaliation claim

was submitted to the jury even when there was a four-year gap between the protected activity and the adverse event because the defendant took adverse action "on its first opportunity to do so"). Further, although Plaintiff alleges a more regularly established pattern of antagonistic acts in 2015 and 2016, (TAC ¶¶ 65–75), he does not allege that he performed any protected act close to that time frame, other than filing the EEOC complaint six to seven years earlier, (*see generally id.* ¶¶ 56–75).

Plaintiff also alleges throughout the TAC that he was treated differently in comparison to white officers at the Police Department. Specifically, Plaintiff claims that he received "lower marks" than "a majority of [w]hite officers whose productivity w[as] inferior to his," (*id.* ¶ 43); other officers received positive recognition and awards in their evaluations, while Plaintiff did not, (*id.* ¶ 44); mistakes made by Plaintiff were highlighted, whereas other officers received only warnings for similar mistakes, (*id.*); when a white officer took over "Sector 2," where Plaintiff had previously been stationed and complained about the workload, it was determined that there was too much work for one officer and the section was split into two, whereas Plaintiff had been reprimanded for making the same suggestion, (*id.* ¶ 51–52); Plaintiff was written up for misuse of a personal day that he took for a religious observance, which a white female officer had similarly done three months earlier, (*id.* ¶ 55); junior white officers received "cheat sheets," whereas Plaintiff was left to "sink or swim," (*id.* ¶ 64 (quotation marks omitted)); no other officers were required to sign a HIPAA release to substantiate a sick day, (*id.* ¶ 68); and no other officers have been subject to termination based on the belief that the officer would likely not follow an instruction, such as signing a HIPAA form, (*id.*).

"[W]here a plaintiff seeks to make out [a] prima facie case by pointing to the disparate treatment of a purportedly similarly situated employee, the plaintiff must show that [he] shared

sufficient employment characteristics with that conspirator so that they could be similarly situated." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001). "An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct." *Ruiz v. County of Rockland*, 609 F.3d 486, 493–94 (2d Cir. 2010) (citation omitted); *see also Henry*, 18 F. Supp. 3d at 408 (noting that to establish a claim for disparate treatment, a comparator must be "similarly situated [to a plaintiff] in all material respects"). "Even on a motion to dismiss, a court must determine whether, based on a plaintiff's allegations in the complaint, it is plausible that a jury could ultimately determine that the comparators are similarly situated." *Buttaro v. City of New York*, No. 15-CV-5703, 2017 WL 1906725, at *3 (E.D.N.Y. May 8, 2017) (citation and quotation marks omitted).

Here, Plaintiff has not successfully alleged that he and the white officers he mentions in the TAC were similarly situated. Instead, "[h]e pleaded only one commonality between himself and the other [individuals]: they were [police officers]." *Van Allen v. N.Y.C. Sch. Constr. Auth.*, No. 17-CV-2176, 2018 WL 4783966, at *10 (E.D.N.Y. Sept. 30, 2018) (record citation omitted). He has not, for example, indicated whether these officers were in the same role and subject to the same performance evaluations and discipline standards as Plaintiff, and for some of the comparators, he has not established that they engaged in comparable conduct. (*See* TAC ¶¶ 43 ("[Plaintiff] received lower marks in many instances than a majority of [w]hite officers whose productivity was inferior to his."), 44 (indicating that Plaintiff's "positive accomplishments" were ignored, while "many other officers received awards for" similar accomplishments and that Plaintiff's mistakes were highlighted, for which "most [w]hite officers at worst received warnings"), 52 ("[A] white officer took over [S]ector [Two][,] and the [S]ector was determined

to be too much for one officer . . . ."), 55 ("Three months prior to [Plaintiff seeking a modified

schedule for a religious observance,] it had been done by a white female officer."),  64

("Supervisors often provided guides or 'cheat sheets' to junior officers . . . .").)  Further, in

several instances, Plaintiff does not refer to a comparator at all, making only sweeping,

conclusory statements.  (*Id.* ¶ 68 ("Never has any other officer in the Town . . . had to sign a

HIPAA release under the same circumstances [Plaintiff] faced . . . and never[] has any other

officer been subjected to a severely adverse disciplinary action . . . based solely on a supervisor's

highly prejudicial 'belief' that the officer would likely not follow a given order.").)  As Judge

Seibel determined in Plaintiff's previous case, Plaintiff has provided insufficient facts from

which the Court could draw an inference of disparate treatment, and, as a result, "[i]t may not be

reasonably inferred from the factual allegations in the [TAC] that any non-African-American or

non-Haitian employee similarly situated to [P]laintiff in all material respects was subject to

differential treatment by . . . [D]efendants."  (Seibel Tr. 12 (citation and quotation marks

omitted).)

     As such, the Court dismisses Plaintiff's retaliation claims under Title VII and 42 U.S.C.

§ 1983.  Given that this is the first adjudication of Plaintiff's claims on the merits, this dismissal

is without prejudice.

### 4.  Discrimination and Hostile Work Environment

     According to Moving Defendants, counsel for Plaintiff represented at a May 15, 2019

pre-motion conference before the Court that Plaintiff would withdraw his discrimination claims.

(Moving Defs.' Reply Mem. 4.)  Plaintiff thereafter removed these claims from the causes of

action listed in his SAC and in the TAC.  (*Id.*; *compare* SAC, TAC *with* Compl. ¶¶ 75–79, 84–

88, 93–96 (including discrimination and harassment as causes of action).)[8]  For example, the

TAC lists three causes of action—retaliation in violation of § 1981, Title VII, and the

NYSHRL—and no causes of action for discrimination or hostile work environment.  (TAC ¶¶

82–92.)  Additionally, although Plaintiff argues in his Opposition that he does state claims for

discrimination and hostile work environment, he also represents that "[t]his suit is a claim about

retaliation . . . [t]hat came from [Plaintiff's] termination."  (Pl.'s Mem. 12.)  Because Plaintiff is

counseled, he "is not entitled to any of the latitude afforded to pro se litigants in adjudicating a

motion to dismiss," *Harty v. Nyack Motor Hotel Inc.*, No. 19-CV-1322, 2020 WL 1140783, at *3

(S.D.N.Y. Mar. 9, 2020) (citations omitted), and the Court need not construe the TAC liberally.

Further, counseled plaintiffs may generally not "use their opposition to [a] motion to dismiss to

raise new claims or arguments."  *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 390

n.19 (S.D.N.Y. 2013) (citation, alterations, and quotation marks omitted); *Kiryas Joel All. v.

Village of Kiryas Joel*, No. 11-CV-3982, 2011 WL 5995075, at *10 n.9 (S.D.N.Y. Nov. 29,

20211) (same), *aff'd* 495 F. App'x 183 (2d Cir. 2012).  To the extent Plaintiff seeks to bring

discrimination and hostile work environment claims in addition to his retaliation claims, Plaintiff

must clarify that he intends to do so in an amended complaint.

### 5.  Police Department

Plaintiff sues the Police Department, but Moving Defendants argue, (Moving Defs.'

Mem. 23), "under New York law, departments which are merely administrative arms of a

municipality[] do not have a legal identity separate apart from the municipality and cannot sue or

be sued."  *Elek v. Incorporated Village of Monroe*, 815 F. Supp. 2d 801, 806 n.2 (S.D.N.Y.

---

[8] No court reporter served during this conference.  (*See* Dkt. (minute entry for May 15, 2019).)  As such, a transcript is not available.

2011) (citation, alterations, and quotation marks omitted).  "[A] police department[] [is] just such an administrative arm[] of [its] corresponding municipality, and therefore cannot sue or be sued." *Howell v. Port Chester Police Station*, No. 09-CV-1651, 2010 WL 930981, at *5 (S.D.N.Y. Mar. 15, 2010) (citation omitted).  Where both the municipality and the municipal agency have been named as defendants, courts have dismissed the claims against the agency.  *See Hall v. City of White Plains*, 185 F. Supp. 2d 293, 303 (S.D.N.Y. 2002) ("Because [the] plaintiff has named the City of White Plains as a defendant, any claims against the [White Plains Department of Public Safety ("WPDPS")] are redundant.  WPDPS does not have its own legal identity, and therefore the claims against it are dismissed."); *Manning v. County of Westchester*, No. 93-CV-3366, 1995 WL 12579, at *2 (S.D.N.Y. Jan. 5, 1995) (removing the Westchester County Police Department as a named defendant where the County of Westchester, as the real party in interest, was already a named defendant).[9]  Accordingly, all of Plaintiff's claims against the Police Department are also dismissed with prejudice.[10]

---

[9] Plaintiff also fails to respond to this argument in his Memorandum, thus waiving any objection to it.  (*See generally* Pl.'s Mem.)  "At the motion to dismiss stage, where review is limited to the pleadings, a plaintiff abandons a claim by failing to address the defendant's arguments in support of dismissing that claim."  *Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08-CV-442, 2014 WL 4723299, at *7 (S.D.N.Y. Sept. 23, 2014) (citation omitted).

[10] Moving Defendants also raise a number of arguments related to the individual Defendants, arguing that the majority of individual Defendants were not involved in Plaintiff's termination, that Plaintiff has insufficiently alleged that Weidel, Hyman, and Matos acted with retaliatory animus, and that the individual Defendants are entitled to qualified immunity. (Moving Defs.' Mem. 19–23.)  Because the Court has dismissed Plaintiff's retaliation claims on the merits, the Court does not address these arguments herein.  If Plaintiff seeks to file a fourth amended complaint, Plaintiff may seek to cure any of these alleged deficiencies.

### 6.  Punitive Damages

Defendants move to dismiss any claims for punitive damages against the Town and individual Defendants sued in their official capacities.  (*See* Defs.' Mem. 23–24.)  Plaintiff does not dispute this portion of Moving Defendants' Motion, (*see generally* Pl.'s Mem.), and the law is clear that municipal defendants may not be held liable for punitive damages, *see Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 254, 256–57 (2d Cir. 2005) (acknowledging the general rule that "no punitive damages are allowed [against municipalities] unless expressly authorized by statute"); *Ivani Contracting Corp. v. New York City*, 103 F.3d 257, 262 (2d Cir. 1997) (holding that an officer sued in his official capacity enjoys the same immunities from punitive damages as the city).  Accordingly, to the extent Plaintiff seeks punitive damages against the Town of Ramapo and individual Defendants in their official capacities, those claims must be dismissed.

### 7.  State Law Claims

Moving Defendants argue that Plaintiff's NYSHRL claims are barred because Plaintiff failed to include them in a notice of claim, and that many of these claims are time-barred. (Moving Defs.' Mem. 8–10.)  However, because the Court has dismissed the TAC, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims at this juncture. *See Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well." (citations omitted)); *Thomas v. Grunberg 77 LLC*, No. 15-CV-1925, 2017 WL 3263141, at *1 (S.D.N.Y. July 28, 2017) (dismissing state claims where the federal claims had been mooted); *Torres v. City of New York*, 248 F. Supp. 2d 333, 334 (S.D.N.Y. 2003) ("Where the basis for pendent jurisdiction is dismissed, ordinarily so should the state law claims be dismissed." (citations omitted)).  To the extent that Plaintiff seeks to file a fourth amended complaint, Plaintiff may

reassert his claims under state law and cure any potential deficiencies raised by Defendants in their Motion.

### III. Conclusion

For the foregoing reasons, Moving Defendants' Motion To Dismiss is granted.  Because this is the first adjudication on the merits of Plaintiff's claims, the dismissal is without prejudice, with the exception of Plaintiff's Title VII claims against the individual Defendants, all claims against the Ramapo Police Department, and any claims for punitive damages against the Town or individual Defendants in their official capacities, which are dismissed with prejudice.  If Plaintiff wishes to file a fourth amended complaint addressing the deficiencies discussed in this Opinion & Order, or any other deficiencies raised in Defendants' Motion, Plaintiff must do so within 30 days of the date of this Opinion & Order.  Plaintiff is advised that the fourth amended complaint will replace, not supplement, all prior complaints.  The fourth amended complaint must contain all of the claims, factual allegations, and exhibits that Plaintiff wishes the Court to consider.  If Plaintiff fails to abide by the 30-day deadline, the Action may be dismissed with prejudice.

The Clerk of Court is directed to terminate the pending Motion, (Dkt. No. 72).

SO ORDERED.

DATED:        September 24, 2020
              White Plains, New York

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

42