UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ERNST THEODORE TENEMILLE,

                                    Plaintiff,

                    v.

TOWN OF RAMAPO, *et al.*,

                                    Defendants.

No. 18-CV-724 (KMK)

<u>OPINION & ORDER</u>

---

<u>Appearances</u>:

Ernst Theodore Tenemille
New City, NY
*Pro Se Plaintiff*

Steven C. Stern, Esq.
Vernee Ciara Pelage, Esq.
Sokoloff Stern LLP
Carle Place, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

Plaintiff Ernst Theodore Tenemille ("Plaintiff") brings this Action against former Town

of Ramapo Supervisor Christopher St. Lawrence ("St. Lawrence"), former Councilman Patrick

Withers ("Withers"), Chief of Police Bradley R. Weidel ("Weidel"), Chief of Staff Thomas

Cokeley ("Cokeley"), Squad Lieutenant Daniel Hyman ("Hyman"), Squad Sergeant Salomon

Matos ("Matos"), Desk Sergeant Christopher Franklin ("Franklin"; collectively, "Individual

Defendants"), and the Town of Ramapo (the "Town" or "Ramapo"; collectively "Defendants"),

alleging that Defendants discriminated against and subsequently retaliated against him on the

basis of his race, color, national origin, and religion, in violation of Section 1983 of the Civil

Rights Act of 1866, 42 U.S.C. § 1983 ("§ 1983"), Title VII of the Civil Rights Act of 1964

("Title VII"), 42 U.S.C. § 2000e, *et seq.*; and New York State Human Rights Law ("NYSHRL"),

N.Y. Exec. Law § 290, *et seq*.  (*See generally* Fourth Am. Compl. ("Fourth AC") (Dkt. No. 88).)

Before the Court is a Motion To Dismiss (the "Motion"), pursuant to Federal Rule of Civil

Procedure 12(b)(6), filed by the Town, Weidel, Cokeley, Hyman, Matos, and Franklin (the

"Moving Defendants").[1]  (Not. of Mot. (Dkt. No. 99).)[2]

For the reasons discussed below, the Motion is granted.

## I.  Background

### A.  Factual Background

The following facts are drawn from Plaintiff's Fourth AC and are assumed to be true for

the purpose of resolving the instant Motion.

#### 1.  Context Regarding Plaintiff's Experiences in the Ramapo Police Department

Plaintiff is a Haitian American who immigrated to the United States from Haiti in 1984.

(Fourth AC ¶ 26.)  After graduating from high school in 1988, Plaintiff joined the U.S. Navy,

from which he was honorably discharged in 1991.  (*Id.* ¶¶ 27–28.)  Plaintiff then graduated from

State University of New York ("SUNY") Rockland Community College in 1999 with an

Associate's degree in criminal justice and from SUNY Purchase in May 2017 with a Bachelor's

degree in liberal studies and a minor in psychology.  (*Id.* ¶¶ 29, 32.)  In 2000, Plaintiff joined the

Rockland Sheriff's Department as a correction officer.  (*Id.* ¶ 30.)  In 2002, he was hired by the

Town of Ramapo Police Department (the "Department") as a police officer.  (*Id.* ¶ 31.)  The

---

[1] Plaintiff names Cokeley in the case caption but omits him when listing the defendants in the Complaint's preliminary statement.

[2] Defendants St. Lawrence and Withers have not appeared in this Action, and, according to Moving Defendants, "[u]pon information and belief," they were never served.  (Mov. Defs.' Mem. of Law in Supp. of Mot. ("Mov. Defs.' Mem.") 22 n.11 (Dkt. No. 101).)  Plaintiff filed affidavits of service indicating that these Defendants were served at Ramapo's Town Hall, (Dkt. Nos. 6, 7, 11, 16), but Moving Defendants represent that these Defendants were not associated with or employed by the Town when service occurred, (Mov. Defs.' Mem. 22 n.11).

following discrete events, which all occurred once he was an employee of the Department, provide context to Plaintiff's claims.

### a. Background Check

In the same year Plaintiff was hired by the Department, he attended the Rockland County Police Academy. (*Id.* ¶ 95.) While there, he was "abruptly pulled out of his training" and asked questions about alleged "'inaccuracies' and concerns about his 'character and background.'" (*Id.*) According to Plaintiff, the detectives who conducted his background check for the Department could not confirm his service with the Navy and claimed that the copy of the "U.S. Navy service discharge form (DD-214)" provided by Plaintiff was fraudulent. (*Id.*) Weidel, who was serving as an Administrative Sergeant at the time, led this investigation, and questioned whether Plaintiff had instead served in the Republic of Haiti's Navy rather than the United States Navy as well as whether Plaintiff had falsified other information on his application, including his age. (*Id.*) Plaintiff was "in fear of losing his employment" due to this incident. (*Id.*) Despite this incident, the information on Plaintiff's application was later confirmed. (*Id.*)

### b. Yelling Incident

In December 2004, Plaintiff heard Sergeant Brian Corbett ("Corbett"), a fellow officer, "rag[e] loudly" against him, during which Corbett "yelled [that Plaintiff] 'does not belong'" in the Department, and that "'[h]e should go back to corrections if they would have him[.]'" (*Id.* ¶ 99.)[3] According to Plaintiff, Corbett then stated that "[African Americans are] only [two-fifths] of a person anyway." (*Id.* (quotation marks omitted).) Plaintiff "immediately notified a

---

[3] Plaintiff does not provide Corbett's first name in the Fourth AC. (*See generally* Fourth AC.) However, Corbett is identified in prior pleadings. (*See generally* Compl. (Dkt. No. 1) (naming Sergeant Brian Corbett as a defendant).)

supervisor," but Corbett "never apologized" for his statements "nor was he ever disciplined in any way for making them." (*Id.*)

### c. Report Writing

Around this time, Plaintiff was "continually advised that he needed to improve his report writing skills," and was told that he had "illegible handwriting." (*Id.* ¶ 97 (quotation marks omitted).) Corbett was Plaintiff's immediate supervisor at the time. (*Id.*) Plaintiff turned in a report on a domestic violence incident to Corbett that contained several errors that had been covered with white-out, and Plaintiff asked Corbett if he could re-copy the report. (*Id.*) Corbett replied that the report was fine, and ultimately reviewed and approved it. (*Id.*) However, the same report was later flagged as "'messy and unprofessional' further up the chain of command," as Corbett then wrote up Plaintiff for "turning in a messy report" despite his earlier approval. (*Id.*) In response, Plaintiff was required to retake a "video-taped[] course on report writing," which he had already taken and passed at the Rockland County Police Academy. (*Id.*) Plaintiff alleges that Corbett pushed the report "up the chain of command" specifically to tarnish Plaintiff and give rise to a "green sheet (supervisory contact report)," which would be brought to the attention of Plaintiff's supervisor and further harm Plaintiff's reputation. (*Id.*)

Due to the complaints he received about his handwriting, Plaintiff began typing his reports. (*Id.* ¶ 98.) Soon after the incident with the report given to Corbett, Squad Lieutenant David Holmes ("Holmes") summoned Plaintiff to speak to him and Sergeant Patrick Reynar ("Reynar"). (*Id.*) Reynar "expressed surprise" at the improved quality of Plaintiff's reports. (*Id.*) During this meeting, Holmes speculated that "'perhaps Plaintiff was having [his] wife complete the reports for [him].'" (*Id.* (alteration in original).) Plaintiff's annual evaluation did not include mention of his improved reports. (*Id.*)

### d.  Prison Cell Incident

In August 2005, Plaintiff supervised a prisoner in a holding cell at the police station.  (*Id.* ¶ 100.)  When the prisoner asked to make a phone call, Plaintiff handed the prisoner the receiver and dialed the number while remaining outside of the holding cell, per Department regulations. (*Id.*)  Plaintiff's supervisor, Lieutenant Leslie Lampert ("Lampert"), who is white, submitted a report into Plaintiff's personnel record stating Plaintiff had in fact gone into the cell.  (*Id.*)[4] Lampert then refused to review camera footage at Plaintiff's behest, which Plaintiff asserts would have exonerated him.  (*Id.*)

### e.  Being Demeaned by a Fellow Officer

In June 2006, Franklin, a white male officer, "demeaned" Plaintiff in front of other officers for issuing a traffic ticket to one of Franklin's friends.  (*Id.* ¶ 101.)  Although Plaintiff complained about this encounter, Franklin was not reprimanded; Franklin was instead promoted shortly after and has continued to thrive in the Department.  (*Id.*)[5]

### f.  Sector Two

The following year, Plaintiff was assigned to cover Sector Two, an area of Ramapo large enough that patrolling it created a "workload [that] was too heavy for one officer to effectively handle."  (*Id.* ¶ 104.)  Plaintiff submits that he raised this to his supervisors but was ignored; he was instead "relentlessly reprimanded for not being fast enough."  (*Id.*)  When Plaintiff was later transferred to a different section of the Town, a white police officer took over Sector Two.  (*Id.*).

---

[4] Lampert's first name is not provided in the Fourth AC or any accompanying materials. However, Lampert is identified in prior pleadings.  (*See* Compl. (Dkt. No. 1) ¶ 39 (identifying Lieutenant Leslie Lampert).)

[5] Franklin is alleged to be a sergeant rather than a lieutenant elsewhere in the Fourth AC. (*Compare id.* ¶ 15 (providing the title of "Sergeant" and "Desk Sergeant" to Franklin) *with id.* ¶ 101 (observing that Franklin was promoted to lieutenant); *id.* ¶ 109 (same).)

That white officer then raised the same complaints Plaintiff had.  (*Id.*)  Following the white officer's complaint, the Department subsequently deemed the sector to be too large of a workload for one officer and split it into two sectors, assigning a second officer to oversee what was once Sector Two.  (*Id.*)  Plaintiff raised "his concern over the difference in treatment and the handling these two identical complaints," but his overtures were ignored.  (*Id.*)[6]

### g.  Shoveling Incident

Also in 2007, Plaintiff states that he and his wife had just endured a miscarriage.  (*Id.* ¶ 102.)  Plaintiff took a legitimate day of sick leave when feeling ill.  (*Id.*)  Despite having taken the day off due to his illness, Plaintiff shoveled his driveway because his wife was medically unable to do so following the miscarriage.  (*Id.*)  An officer witnessed him shoveling.  (*Id.*)  That officer then reported to others in the Department, who came to conclude that "Plaintiff had misled the [D]epartment regarding his reported sick day."  (*Id.*)  Plaintiff was not offered the opportunity to explain himself or get the report expunged.  (*Id.*)

### h.  Scheduling Request

In or around June 2008, the Department accommodated a newly hired Jewish officer's request for a modified schedule pursuant to a religious accommodation request without question or pushback.  (*Id.* ¶ 105.)  Plaintiff subsequently requested a modified schedule to accommodate his religious beliefs as a Seventh Day Adventist.  (*Id.*)  Months after filing the request, it was only partially honored: Plaintiff would only be allowed to take off days for the Sabbath if he had already scheduled it and if he had personally identified an officer willing to work the scheduled shift.  (*Id.*)

---

[6] Plaintiff alleges that the letters of reprimand he received for his allegedly substandard patrolling of Sector Two were unearthed and then later used against him to "justify" his termination, (*id.*), but he does not articulate how these letters were used.

In fall of 2009, Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") regarding the religious observance disparities.  (*Id.* ¶ 106).  Following his complaint, the EEOC issued a right to sue letter.  (*Id.*)  Simultaneously, the instances of discriminatory conduct temporarily dissipated for fear of suit.  (*Id.*)  Notwithstanding the letter's issuance, Plaintiff forewent filing suit in order to avoid causing further discord within the Department.  (*Id.*)

### i.  Euthanization Incident

In June 2010, Plaintiff was again written up in a report alleging that he "us[ed] too many rounds . . . to euthanize an injured animal."  (*Id.* ¶ 107.)  According to Plaintiff, the Department does not have a policy as to how many rounds constitute "too many."  (*Id.*)  Nonetheless, as a result of this incident, Plaintiff was forced to undertake "remedial firearms training[,] []which he passed with excellence[.]"  (*Id.*)

### j.  Traffic Ticket Deletion

In December 2012, Plaintiff noticed that traffic tickets he had issued were deleted from the records of the Town and Department, and none of Plaintiff's supervisors knew what had happened to them.  (*Id.* ¶ 108.)  Plaintiff lodged a written complaint, for which he was "severely reprimanded, sanctioned[,] and . . . was subjected to a psychological evaluation and test."  (*Id.*; Fourth AC Ex. 14.)  It was later discovered that Franklin was responsible for deleting the tickets. (Fourth AC ¶ 109.)  Franklin was "minimally reprimanded" for having done so and was not required to undergo a "psychological test."  (*Id.* ¶ 109.)  Moreover, despite his misconduct, Plaintiff alleges that the Department recently promoted Franklin.  (*Id.*)

### k.  Political Solicitation

In September 2013, the "then [Police Benevolent Association] president (and now)[] Detective Dennis Procter" used the Department's email system to solicit the personal e-mail

addresses of officers "for the political benefit of Councilman . . . Withers," who was
campaigning for re-election as councilman.  (*Id.* ¶ 110.)  Plaintiff was the only officer solicited
who declined to provide his email address, which "generated a wave of discriminatory and
retaliatory backlash" until Plaintiff was later terminated in 2016.  (*Id.*)  Plaintiff alleges that
Withers "played a decisive role" in this reaction.  (*Id.*)

### l.  Insufficient Evaluation

During Plaintiff's annual evaluation in 2014, which was delivered by Hyman, it was not
mentioned that Plaintiff had stopped an attempted suicide.  (*Id.* ¶ 111.)  This was remedied and
the action was noted in his evaluation, but only after Plaintiff protested.  (*Id.*)  The evaluation
also noted that Plaintiff had had the fourth most arrests by any officer in the Department in 2014,
despite being injured and unable to work for a month, and that he was recommended for a
"Lifesaving Award."  (*Id.*)  Further, "commendation letters" Plaintiff received as a result of his
actions were omitted from his evaluation.  (*Id.*)  Despite these plaudits, Plaintiff received a rating
of "Average" for the year.  (*Id.*)  Moreover, he never received the "Lifesaving Award."  (*Id.*)
Instead, his 2014 evaluation noted that Plaintiff was written up when he responded, "Great idea,"
to an e-mail sent by Weidel because Plaintiff "should have known that no response was
necessary."  (*Id.*) (quotation marks omitted).

### 2.  The Events Giving Rise to Plaintiff's Termination

From November 2 through November 5, 2015, Plaintiff took sick days.  (Fourth AC
Ex. 16, at 1, 5.)  Pursuant to the Department's policy, any officer taking more than three
consecutive sick days "shall, no later than the fourth day of sick absence, provide to the
Department a physician's or dentist's note reflecting the date(s) of visitation at the
physician/dentist office, the illness or injury for which treatment was administered, a prognosis, a
diagnosis, and the anticipated period of illness."  (Fourth AC Ex. 5, at § C.2.f.)  Additionally, the

policy makes plain that "[n]on-compliance with this provision may result in loss of pay for the period of absence and disciplinary charges."  (*Id.*)

Plaintiff submitted two notes from Dr. Stephen Klein dated November 5, 2015 and a third note dated November 9, 2015.  (*See* Fourth AC Ex. 11, 15.)[7]  The first note reads, in pertinent part, "Ernest Tenemille (11/15/1970) is currently under my medical care and was seen in the office on 11/03/2015.  Please excuse his absence from work on 11/4/2015 and 11/5/2015." (Fourth AC Ex. 15, at 1.)  The second note repeats these sentences in full, and then reads: "This patient was seen for musculoskeletal pain to the left distal arm which [*sic*] he was advised to wear a brace for 2 weeks.  This patient can return to work at earliest convenience with no limitations."  (*Id.* at 2.)  The final note reads: "Ernest Tenemille (11/15/1970) is currently under my medical care and may return to [*sic*] on 11/08/2015.  Was also seen on 11/3/2015. Dx [diagnosis]: left forearm/wrist pain. Activity is restricted as follows: none[.]"  (*Id.* at 3.)

According to Hyman's testimony, the Department initiated an investigation upon the suspicion that Plaintiff was abusing his sick leave days, in part because the doctor's notes purportedly omitted details necessary to comply with the Department's policy.  (*See generally* Fourth AC Ex. 3; *see also* Fourth AC ¶ 42.)  On November 23, 2015, Plaintiff was ordered to sign a Health Insurance Portability and Accountability Act ("HIPAA") release pursuant to the Department's investigation, which narrowly sought medical records relating to Plaintiff's injury and corresponding sick days.  (Fourth AC ¶¶ 42, 51.)  Plaintiff demurred and ultimately declined to sign the release.  (*Id.* ¶ 51.)  Plaintiff wrote to a superior officer detailing his reasoning for

---

[7] It is not clear to the Court when the doctor's notes were submitted.  Email records suggest the notes were submitted on November 5 and 9, respectively, though that is not certain. (*See* Fourth AC Ex. 11, at 1–2.)  The date of submission is not of paramount importance, as neither Party relies upon it in any material way.

declining to sign the release and signaling an openness to do so upon "proof" that the Department was entitled to the information sought.  (*Id.*)

At 11:40 p.m. on November 30, 2015, Plaintiff received a second order to sign, approve, notarize, and return a HIPAA release form regarding "medical records in connection with the investigation of your absence from duty on November 2,3,4,5 [*sic*]."  (Fourth AC Ex. 16, at 1.)  Moreover, the release was to be returned within 24 hours.  (*Id.*; Fourth AC ¶ 64.)  In response, Plaintiff did not refuse to follow the order but instead questioned Department's authority to require such an action.  (Fourth AC ¶ 64.)  Notwithstanding Plaintiff's inquiry, Matos represented to Weidel that Plaintiff refused to sign the order.  (*Id.* ¶ 54.)  Following this refusal, Plaintiff "endure[d] two days of interrogation, without the benefit of effective counsel" regarding this episode.  (*Id.* ¶ 104.)[8]

On March 10, 2016, "charges against Plaintiff were drawn" in relation to this episode.  (*Id.* ¶ 48.)  The following day, the charges were "issued to Plaintiff."  (*Id.*)  "Plaintiff asserts that [the issuance of charges] marked the official beginning of the process which ultimately led to Plaintiff's termination."  (*Id.* ¶ 20.)  Plaintiff litigated his charges before a hearing officer in the months that followed.  (*Id.* ¶¶ 21, 47).

Ultimately, Plaintiff was terminated on November 16, 2016.  (*Id.* ¶ 19.)

On or about October 4, 2017, Plaintiff filed a second complaint with the EEOC, alleging "unlawful discriminatory employment practices because of race/color, national origin, age, sex, and religion."  (*Id.* ¶ 22.)  On October 30, 2017, "the EEOC rendered a determination finding to

---

[8] Plaintiff does not state in the Fourth AC when this interrogation occurred.  (*See generally* Fourth AC.)  However, in Plaintiff's Third Amended Complaint ("TAC"), Plaintiff asserted that it took place on December 16 and 17, 2015.  (*See* TAC ¶¶ 69, 70 (Dkt. No.67).)

support the allegations of the October 4[,] 2017 [c]omplaint" and issued to Plaintiff a right-to-sue letter.  (*Id.* ¶¶ 22–23.)

Beyond the discrete events discussed above, Plaintiff alleges that during the course of his employment, he consistently "fe[lt] degraded, unappreciated and not welcomed," describing his experience as "isolating" and likening his status to one of "an escaped convict posing as a police officer."  (*Id.* ¶ 98.)  He was "continually singled out" by other officers "including his direct supervisor[,] [a]ll of whom, collectively or in part, subjected Plaintiff to a constant bombardment of discrimination and harassment."  (*Id*. ¶ 96.)

### B.  Procedural Background

Plaintiff filed his original Complaint on January 26, 2018, at which point he was proceeding pro se.  (Dkt. No. 1.)  On March 19, 2018, Plaintiff filed an Amended Complaint. (Dkt. No. 20.)  On April 3, 2018, Moving Defendants filed a pre-motion letter seeking to file a Motion To Dismiss the Amended Complaint, and the Court scheduled a pre-motion conference. (Dkt. Nos. 22–23.)  Prior to the conference, Plaintiff filed two applications for pro bono counsel, which the Court denied without prejudice.  (Dkt. Nos. 27–29.)  On June 12, 2018, the Court held a pre-motion conference and set a briefing schedule for Moving Defendants' Motion To Dismiss the Amended Complaint.  (Dkt. (minute entry for June 12, 2018).)  After receiving leave to file excess pages and an extension from the Court, (Dkt. Nos. 31, 36), Moving Defendants filed their Motion To Dismiss the Amended Complaint on August 21, 2018, (Dkt. Nos. 33–35), after which Plaintiff obtained counsel, (Dkt. Nos. 41–42).  Plaintiff filed a Response to the Motion To Dismiss the Amended Complaint on November 2, 2018, (Dkt. No. 46), after receiving an extension from the Court, (Dkt. No. 45).  Also after receiving an extension, (Dkt. No. 48), Moving Defendants filed their Reply, (Dkt. No. 49).

On March 29, 2019, the Court issued an Order denying Moving Defendants' Motion To Dismiss the Amended Complaint without prejudice, given that Plaintiff asserted in his Response that he had challenged his termination in an Article 78 proceeding that was pending in New York state court.  (Order 1–2 (Dkt. No. 50).)  As such, the Court directed Plaintiff to clarify which claims had been raised in the Article 78 proceeding.  (*Id.* at 2.)  The Court also noted that some of Plaintiff's claims in the Amended Complaint had already been adjudicated and dismissed in a separate action before Judge Seibel on June 25, 2015, except for claims related to Plaintiff's termination.  (*Id.* at 1.)  Plaintiff filed his supplemental response to this Order on April 12, 2019, to which Moving Defendants replied on May 8, 2019.  (Dkt. Nos. 51, 54.)  The Court held another pre-motion conference on May 15, 2019, after which Plaintiff filed a Second Amended Complaint on June 17, 2019.  (*See* Dkt. (minute entry for May 15, 2019); Second Am. Compl. (Dkt. No. 57).)  On July 1, 2019, Moving Defendants sought to file another Motion To Dismiss, (Dkt. No. 58), which Plaintiff opposed, (Dkt. Nos. 60, 62).  The Court scheduled a pre-motion conference for August 22, 2019, which was then rescheduled to September 10, 2019.  (Dkt. Nos. 63, 65.)  At the pre-motion conference, Plaintiff represented that he would file a Third Amended Complaint ("TAC"), which he did on October 9, 2019.  (*See* Dkt. (minute entry for September 10, 2019); Dkt. No. 67.)

On October 23, 2019, Moving Defendants once again sought to file a Motion To Dismiss the TAC, and the Court set a briefing schedule on October 30, 2019.  (Dkt. Nos. 68–69.)  After receiving an extension from the Court, (Dkt. No. 71), Moving Defendants filed a Motion To Dismiss on December 19, 2019.  (Dkt. No. 72.)  After the Court granted his request for an extension, Plaintiff filed his Response on February 3, 2020.  (Dkt. No. 77).)  Moving Defendants filed a Reply on February 18, 2020.  (Dkt. No. 78).)

On September 24, 2020, the Court granted Moving Defendants' Motion To Dismiss without prejudice, with the exception of Plaintiff's Title VII claims against the Individual Defendants, all claims against the Ramapo Police Department, and any claims for punitive damages against the Town or individual Defendants in their official capacities, which were dismissed with prejudice. (Op. & Order ("Op.") 42 (Dkt. No. 79).) The Court made clear in its opinion that Plaintiff had the right to file a fourth amended complaint within 30 days pursuant to its ruling.

Plaintiff availed himself of that right, filing the Fourth AC on December 1, 2020. (Dkt. No. 88.) Per the Fourth AC, Plaintiff seeks declaratory and injunctive relief as well as compensatory damages, punitive damages, and attorneys' fees and costs. (Fourth AC 36–37.)

On January 17, 2021, Moving Defendants submitted a Letter Motion requesting a pre-motion conference in anticipation of moving to dismiss the Fourth AC. (Dkt. No. 93.) On February 1, 2021, the Court set a briefing schedule. (Dkt. No. 95.) Moving Defendants filed the instant Motion on March 22, 2021. (Not. of Mot.; Decl. of Vernée Pelage, Esq. in Supp. of Mot. (Dkt. No. 100); Mov. Defs.' Mem. of Law in Supp. of Mov. Defs.' Mot. To Dismiss ("Mov. Defs.' Mem.") (Dkt. No. 101).) Plaintiff filed his Response in the form of a Letter Response on April 13, 2021.[9] (Pl.'s Mem. of Law in Opp'n to Mot. ("Pl.'s Mem.") (Dkt. No. 102).) Moving Defendants filed a Reply on May 13, 2021. (Mov. Defs.' Reply Mem. of Law in Further Supp. of Mot. ("Mov. Defs.' Reply Mem.") (Dkt. No. 104).)

---

[9] The Letter Response was dated April 12, 2021. (*See* Dkt. No. 102.)

## II.  Discussion

### A.  Standard of Review

A complaint "does not need detailed factual allegations" to survive a motion to dismiss. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  However, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (alteration and quotation marks omitted).  Said otherwise, compliance with Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In practice, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 563.  A plaintiff need show "only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.  If a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed." *Id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering Moving Defendants' Motion, the Court is required to "accept as true all of the factual allegations contained in the [Fourth AC]." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (same).  Additionally, the Court must "draw[] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).  Furthermore, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted).

The Court also undertakes its analysis in this case with a particular lens.  As the Supreme Court has stated, "[a] document filed pro se is to be liberally construed and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson*, 551 U.S. at 94 (quotation marks, citations, and italics omitted); *see also Darby v. Greenman*, 14 F.4th 124, 127–28 (2d Cir. 2021) (same) (citing *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013)).[10]  This means that a court must "'interpret[] [a pro se complaint] to raise the strongest arguments that [it] suggest[s].'" *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)).  Moreover, when a plaintiff proceeds pro se, the Court may consider "materials outside the

---

[10] It could be argued that Plaintiff ought to be entitled to far less deference, having enjoyed the benefit of counsel's assistance in the filing of prior complaints in this action.  *Cf. CIT Grp./Com. Servs., Inc. v. Prisco*, 640 F. Supp. 2d 401, 407 (S.D.N.Y. 2009) (holding that pro se pleadings are not entitled to relaxed standard when an attorney has assisted in the drafting in some material way).  But for reasons set forth, even a relaxed standard does save Plaintiff's claims in the Fourth AC from dismissal.

complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted), including "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted).

### B. Analysis

Moving Defendants argue that: (1) many of Plaintiff's claims are time-barred, (Mov. Defs.' Mem. 8–11); (2) the Court has already made findings on Plaintiff's claims, which constitutes the law of the case, (*id.* at 8); (3) Plaintiff failed to include his state law claims in his notice of claim, (*id.* at 10–11); (4) Plaintiff fails to state a prima facie claim for discrimination or a hostile work environment, (*id.* at 11–19); (5) Plaintiff fails to state a prima facie claim of retaliation, (*id.* at 19–21); and (5) Plaintiff fails to state a claim for negligent hiring, retention, and supervision, (*id.* at 21–22). Moving Defendants also argue that one of the individual Defendants, Cokeley, should be dismissed, that Plaintiff fails to allege that the remaining individual Defendants acted with retaliatory animus, and that, in any event, the individual Defendants are entitled to qualified immunity. (*Id.* at 19–25.)

### 1. Prior Dismissal of Two of Plaintiff's Causes of Action

The Court previously dismissed with prejudice Plaintiff's "Title VII claims against the individual Defendants, all claims against the Ramapo Police Department, and any claims for punitive damages against the Town or individual Defendants in their official capacities." (Op. 42.) As Moving Defendants observe, Plaintiff "removed Corbett and Holmes" from the case caption in the Fourth AC. (Mov. Defs.' Mem. 23.) So, too, did Plaintiff remove Officers William Gravina and Al Gumbs as well as the Town of Ramapo Police Department. (*Compare* TAC 1 (case caption) *with* Fourth AC 1 (case caption).) Notwithstanding these limited removals,

the remaining Defendants subject to the Fourth AC include the majority of those previously named in the TAC, including many individual Defendants. With this in mind, the Court turns back to Plaintiff's claims.

Plaintiff's causes of action group all Defendants together for each claim. (*See, e.g.*, Fourth AC ¶ 69.) Thus, the Court interprets each of those claims to be made against each of the Defendants named in the caption, meaning the causes of action filed under Title VII pertain to the individual defendants. As stated above, the First Cause of Action (Retaliation in Violation of Title VII) against all Moving Defendants save for the Town of Ramapo have already been dismissed because "individual defendants cannot be held liable under Title VII." (Op. 22 (citing *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 687 (S.D.N.Y. 2012)).) This reasoning applies to both the First Cause of Action as well as the Fourth Cause of Action (Discrimination and Harassment in Violation of Title VII). *See, e.g.*, *Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 107 n.10 (2d Cir. 2011) ("[A]n individual defendant with supervisory control may not be held personally liable under Title VII."); *Perry v. State of N.Y. Dep't of Lab.*, No. 02-CV-7566, 2003 WL 22327887, at *1 (S.D.N.Y. Oct. 10, 2003) (concluding that the "Second Circuit has unambiguously denied" holding individuals liable under Title VII). Because this precedent continues to govern Plaintiff's claims, the Court dismisses with prejudice Plaintiff's First and Fourth Causes of Action. *See Denny v. Barber*, 576 F.2d 465, 471 (2d Cir. 1978) (holding that the plaintiff was not entitled to "a third go-around); *Jackson v. NYS Dep't of Lab.*, No. 09-CV-6608, 2012 WL 843631, at *2 (S.D.N.Y. Mar. 12, 2012) ("Where, as here . . . the [c]ourt has explained in detail the defects in the original complaints, instructed plaintiff on how to rectify her claims and afforded her an opportunity to do so in a second amended complaint, dismissal with prejudice is justified.").

### 2.  Statutes of Limitations

#### a.  Title VII

To the extent Plaintiff's Title VII claims remain, i.e. solely against the Town, Moving Defendants argue that the Court has already made findings relating to their prior arguments that many of Plaintiff's claims are time-barred.  (Mov. Defs.' Mem. 8–9.)

"The law of the case doctrine commands that 'when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case' unless 'cogent and compelling reasons militate otherwise.'" *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) (quoting *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002)), *cert. denied*, 560 U.S. 919 (2010); *see also In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991) ("Under the law of the case doctrine, a decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation.").  "The law of the case doctrine is admittedly discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment."  *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992); *see also Arizona v. California*, 460 U.S. 605, 618 (1983) ("Law of the case directs a court's discretion, it does not limit the tribunal's power."); *First Nat'l Bank of Hollywood v. Am. Foam Rubber Corp.*, 530 F.2d 450, 453 n.3 (2d Cir. 1976) ("In this Circuit, the law of the case is a discretionary doctrine that need not be applied when no prejudice results from its omission."), *cert. denied*, 429 U.S. 858 (1976).

The Court sees no reason to reverse its prior rulings on this issue.  As the Second Circuit has observed, "[t]he major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."  *Virgin Atl. Airways*, 956 F.2d at 1255 (quoting marks omitted).  No such impetus is present.

Plaintiff fails to substantively respond to Moving Defendants' argument regarding the law of the case doctrine; Plaintiff instead responds in kind, accusing Defendants of initiating time-barred actions. (Pl.'s Mem. 4.) Plaintiff's argument is as follows: the Rockland County Police Act "governs the functions of all police departments in Rockland County, dictates that ' . . . charges shall not be brought more than sixty days after the time when the facts upon which such charges are based are known to the town board,'" and the charges against Plaintiff were drawn on March 10, 2016, which is 130 days from the final date at which Defendants allege Plaintiff committed any professional misconduct worthy of firing. (*Id.*) Plaintiff essentially makes the point that the Department, including several defendants therein, acted improperly by firing him after they were permitted to do so. (*Id.*)

This response fails to grapple with either of the Moving Defendants' arguments with respect to whether Plaintiff's Title VII claims are time-barred. This issue—whether Defendants acted improperly pursuant to the laws governing Rockland County Policy activity—is not before the Court, and the Court therefore does not opine on it. Thus, in effect, Plaintiff's non-responsive answer is a de facto concession of Defendant's timeliness argument. "A plaintiff effectively concedes a defendant's arguments by his failure to respond to them." *Felske v. Hirschmann*, No. 10-CV-8899, 2012 WL 716632, at *3 (S.D.N.Y. Mar. 1, 2012) (collecting cases); *see also Lopez Canas v. Whitaker*, No. 19-CV-6031, 2019 WL 2287789, at *5 (W.D.N.Y. May 29, 2019) ("It is well settled in this Circuit that a plaintiff effectively concedes a defendant's arguments by his failure to respond to them" (alteration and quotation marks omitted)); *Miles v. Walawender*, No. 10-CV-973, 2013 WL 1908304, at *1 (W.D.N.Y. May 7, 2013) ("[The] [p]laintiff's opposing [m]emorandum of [l]aw does not respond to this argument, and effectively concedes these arguments by his failure to respond to them." (alteration, citation,

and quotation marks omitted)).  This alone favors granting Moving Defendants' Motion on this claim.

Nevertheless, turning to the merits of whether Plaintiff's Title VII claims are time-barred, the Court has reviewed its prior analysis, (*see* Op. 15–17), and sees no reason to upend it.  The Court will therefore continue to consider Plaintiff's firing, which occurred on December 16, 2016, (Fourth AC ¶ 33) as a "timely allegation of an adverse employment action" and will "consider [his] other allegations as 'background evidence' to determine whether that adverse action was the result of a discriminatory motive." (Op. 17 (quoting *Hagan v. City of New York*, 39 F. Supp. 3d 481, 496 n.10 (S.D.N.Y. 2014))).

### b.  Section 1983

In Plaintiff's TAC, his First Cause of Action is titled "Retaliation in Violation of Section 1981," and the substance of the claim sounds in § 1981.  (TAC 20.)  The Court, following briefing on the matter, concluded that the claims are more appropriately considered under § 1983.  (Op. 17–19.)  Following the Court's Opinion, Plaintiff changed the title of the First Cause of Action of the Fourth AC to read "Retaliation in Violation of Section 1983," but the text of this cause of action nevertheless cites § 1981.  (Fourth AC 16 & ¶¶ 66–69.)  Whether Plaintiff's claims are brought under § 1981 or § 1983 therefore emerges once more.

Moving Defendants argue that Plaintiff's retaliation claims against a municipality and state actors are brought under § 1983, referencing the Court's prior decision on this point.  (Mov. Defs.' Mem. 9–10.)  Moving Defendants therefore argue that Plaintiff's claims pre-dating January 28, 2015, are time-barred per its prior ruling.  (*Id.*)

As stated previously, Plaintiff fails to respond substantively to Moving Defendants' argument that the Court has already decided this issue and that, notwithstanding this prior decision, the claims are time-barred.  (*See* Pl.'s Mem. 4.)

Putting aside Plaintiff's apparent concession of this point, the Court concludes that its

prior decision was correct and that these claims are properly brought under § 1983. (*See* Op. 17–

19.) Moreover, the Court remains of the opinion that Plaintiff's "claims of discrete acts of

retaliation and discrimination brought pursuant to § 1983 that occurred prior to January 28, 2015

are time-barred" and "to the extent these allegations provide 'context and support for the timely

claims that Plaintiff asserts,' the Court will consider them." (Op. 19 (quoting *Allen*, 51 F. Supp.

3d at 510 n.2).)[11]

### 3. Failure to State a Claim for Discrimination Under Title VII and § 1983

Plaintiff brings claims for discrimination under Title VII, § 1983, and the NYSHRL.

(Fourth AC ¶¶ 75–86.) These claims are all evaluated using the same framework. *See Brown v.*

*City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (deploying the *McDonnell Douglas*

framework for race discrimination claims under Title VII and the NYSHRL); *Ruiz v. County of*

*Rockland*, 609 F.3d 486, 491–92 (2d Cir. 2010) (same for § 1983 claims).

"To establish a claim of racial discrimination a claimant 'must show: (1) he belonged to a

protected class; (2) he was qualified for the position he held; (3) he suffered an adverse

employment action; and (4) that the adverse employment action occurred under circumstances

---

[11] Moving Defendants also assert that Plaintiff's state law claims—which include the
Third Cause of Action (retaliation in violation of the NYSHRL), Sixth Cause of Action
(discrimination and harassment in violation of the NYSHRL), and Seventh Cause of Action
(negligent hiring, retention, and supervision)—are similarly time-barred as a result of their notice
mechanism. (Mov. Defs.' Mem. 10–11.) Because the Court has dismissed the Fourth AC, the
Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims and thus
does not opine on the merits of this argument. *See Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d
Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims
should be dismissed as well."); *Thomas v. Grunberg 77 LLC*, No. 15-CV-1925, 2017 WL
3263141, at *1 (S.D.N.Y. July 28, 2017) (dismissing state claims where the federal claims had
been dismissed as moot); *Torres v. City of New York*, 248 F. Supp. 2d 333, 334 (S.D.N.Y. 2003)
("Where the basis for pendent jurisdiction is dismissed, ordinarily so should the state law claims
be dismissed.").

giving rise to an inference of discriminatory intent.'"  *Brown*, 673 F.3d at 150 (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008)); *see also Salu v. Miranda*, 830 F. App'x 341, 345 (2d Cir. 2020) (summary order) (same); *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 350 (S.D.N.Y. 2006) (same) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Once plaintiff establishes a prima facie case, the "burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's [adverse action]." *McDonnell Douglas*, 411 U.S. at 802.  "If the employer puts forth a legitimate, non-discriminatory justification, the presumption drops out of the analysis and the plaintiff must establish, by a preponderance of the evidence, that the employer's justification is a pretext for discrimination."  *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107–08 (2d Cir. 2019) (quoting *Legg v. Ulster County*, 820 F.3d 67, 73–74 (2d Cir. 2016)).  For the reasons set forth, Plaintiff does not establish a prima facie case for discrimination.

Plaintiff has established that he belongs to a protected class.  It is undisputed that Plaintiff "is an African–American . . . whose race places [him] in a protected class."  *Hill*, 467 F. Supp. 2d at 350 (citing *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999)).  (*See also* Fourth AC ¶ 26 (Plaintiff is an "African-American citizen, who immigrated from the Republic of Haiti").)

Plaintiff has also established that he was qualified for the position in question.  The standard for one's qualification to hold a position in a discrimination claim is "minimal." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001).  This question "should focus on the plaintiff's competence and whether he possesses the basic skills necessary for performance of [the] job."  *Ruiz*, 609 F.3d at 492 (quotation marks omitted) (alteration in original).  In light of Plaintiff's military service, prior position as a correction officer, and law

enforcement training, the Court finds Plaintiff has plausibly alleged that he was qualified for the job from which he was terminated.

Plaintiff's termination constitutes an adverse employment action.  "An adverse employment action is a materially adverse change in the terms and conditions of employment," *Torre v. Charter Commc'ns, Inc.*, 493 F. Supp. 3d 276, 286 (S.D.N.Y. 2020) (citing *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008)), that rises above "'a mere inconvenience or an alteration of job responsibilities,'" *Brown*, 673 F.3d at 150 (quoting *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006)).  Put another way, this standard is only met when an action is "of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." *Albuja v. Nat'l Broad. Co. Universal, Inc.*, 851 F. Supp. 2d 599, 606 (S.D.N.Y. 2012) (quoting *Torres v. Pisano*, 116 F.3d 625, 632 (2d Cir. 1997)).  As determined above, given the application of the statute of limitations, the only potential adverse employment actions are the order for Plaintiff to release his medical records and his subsequent termination.  Courts in the Second Circuit have explained that "[e]xamples of materially adverse changes include *termination of employment*, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Karupaiyan v. CVS Health Corp.*, No. 19-CV-8814, 2021 WL 4341132, at *12 (S.D.N.Y. Sept. 23, 2021) (emphasis added) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)).  Thus, Plaintiff's firing is an adverse employment action.

The demand that Plaintiff sign a HIPAA release, on the other hand, is not.  As the aforementioned examples make clear, an adverse event must have a tangible impact on the employee's responsibilities, title, or compensation.  An inquiry brought about by suspicion of a

rule violation bears no such resemblance to these categories of harms. For that reason, the Second Circuit has held that being questioned by a supervisor—as well as a supervisor's attempt to access an employee's computer, an act arguably comparable to a request to review an employee's medical records, as here—does not constitute an adverse event. *See Chang v. Safe Horizons*, 254 F. App'x 838, 839 (2d Cir. 2007) (summary order) (holding, on a motion for summary judgment, that "oral and written warnings issued by [a plaintiff's supervisor], [the plaintiff's] being questioned by [her supervisor], and [the supervisor's] attempt to access [the plaintiff's] computer do not constitute materially adverse actions in the view of a reasonable employee" (quotation marks omitted)); *see also Lee v. Verizon Wireless, Inc.*, No. 07-CV-532, 2008 WL 4479410, at *7 (D. Conn. Sept. 26, 2008) (holding at the summary judgment stage that "questioning by supervisors, manipulation of an employee's workspace and oral or written warnings based on documented company policy violations are not materially adverse actions in the view of a reasonable employee and constitute, at best, trivial harms which are not actionable." (quotation marks omitted)); *cf. Hoffman v. Baltimore Police Dep't*, 379 F. Supp. 2d 778, 792 (D. Md. 2005) (concluding that "[t]he few courts that have considered whether an investigation, *by itself*, can constitute an adverse employment action have answered that question in the negative.").

In an analogous example—albeit one decided at the summary judgment stage—a court in this district found that "being asked to bring in a doctor's note to substantiate a request for sick leave in compliance with [a government organization's personnel] policy" was not an adverse event for purposes of discrimination.[12] *Blake v. Potter*, No. 03-CV-7733, 2007 WL 2815637, at

---

[12] "Claims of employment discrimination under [§] 1981 are analyzed under the same framework that applies to Title VII claims and claims under [§] 1983." *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 576 (S.D.N.Y. 2011) (collecting cases).

*9 (S.D.N.Y. Sept. 25, 2007), *aff'd*, 330 F. App'x 232 (2d Cir. 2009), *cert. denied*, 558 U.S. 1138 (2010).  Considering the applicable precedent in this Circuit as well as the tangible impact of the order itself, the Court finds that the order issued to Plaintiff to release narrowly tailored medical records in response to suspicion of a policy violation does not constitute an adverse employment action.  Thus, the sole adverse employment action at issue under which Plaintiff may make a discrimination claim is his termination.

Plaintiff's claims in this arena thus turn on whether his firing, "the adverse employment action[,] occurred under circumstances giving rise to an inference of discriminatory intent.'" *Brown*, 673 F.3d at 150.  It is at this point that Plaintiff's claim falters.

"To establish an inference of discrimination, a plaintiff must allege that []he was similarly situated in all material respects to the individuals with whom []he seeks to compare [him]self." *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014) (quotation marks omitted).  Plaintiff notes that he was under the care of the same doctors as other officers.  (Fourth AC ¶ 35.)  Plaintiff also asserts that he "has submitted many doctor's notes previously which have all been acceptable."  (*Id.* ¶ 41 (citing Fourth AC Ex. 4).)  But what Plaintiff submitted was in fact testimony of Matos regarding prior notes.  (*See* Fourth AC Ex. 4.)  There is no apples-to-apples comparison to be made between otherwise analogous notes.  Absent such comparative exemplars, Plaintiff's theory of discrimination is unsupported.  *See Farooq v. N.Y.C. Health & Hosps. Corp.*, No. 19-CV-6294, 2020 WL 5018387, at *8 (S.D.N.Y. Aug. 25, 2020) (concluding that failure to "identify comparators, let alone to provide any specificity as to [his] alleged comparators' [similarities] is fatal to [his] claims" (quotation marks omitted) (collecting cases)).

Because Plaintiff has failed to sufficiently plead facts that give rise to an inference of discriminatory intent, Moving Defendants' Motion with respect to Plaintiff's Causes of Actions

regarding an allegedly discriminatory workplace under Title VII and § 1983 is granted and

Plaintiff's correspondent causes of action are dismissed with prejudice.  *See Shcherb v. Angi*

*Homeservices Inc.*, No. 19-CV-367, 2020 WL 2571041, at *2 (S.D.N.Y. May 21, 2020) ("When

a plaintiff does not correct the defects in an initial pleading through the filing of a more detailed

amended complaint, the amended complaint may be dismissed with prejudice." (quoting *Liner v.*

*Goord*, 115 F. Supp. 2d 432, 434 (S.D.N.Y. 2000))).

### 4.  Failure to State a Claim for a Hostile Work Environment Under Title VII and § 1983

"To prevail on a hostile work environment claim under Title VII, 'a plaintiff must first

show that the harassment was sufficiently severe or pervasive to alter the conditions of the

victim's employment and create an abusive working environment.'"  *Lewis v. N. Gen. Hosp.*, 502

F. Supp. 2d 390, 402 (S.D.N.Y. 2007) (quoting *Feingold v. New York*, 366 F.3d 138, 149 (2d

Cir. 2004)).  "Second, a hostile work environment claim under Title VII requires a showing that

the conduct occurred because of [the] plaintiff's membership in a protected class."  *Id.* (citing

*Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999)).  "Finally, the plaintiff must

demonstrate that a specific basis exists for imputing the conduct that created the hostile

environment to the employer."  *Id.* (citing *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708,

715 (2d Cir. 1996)).

When deciding if a plaintiff has established a prima facie case of a hostile work

environment, a court must "look[] at all the circumstances.  These may include the frequency of

the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a

mere offensive utterance; and whether it unreasonably interferes with an employee's work

performance."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).  This inquiry has "both a

subjective and an objective component."  *Lewis*, 502 F. Supp. 2d at 402.  Not only is the Court to

evaluate objective metrics such as the "frequency" of such actions, but it must also take into consideration "the employee's psychological well-being," which bears on "whether the plaintiff actually found the environment abusive." *Harris*, 510 U.S. at 23.

Plaintiff's allegations convince the Court that the subjective prong of this inquiry has been satisfied. As highlighted previously, Plaintiff alleges that his treatment left him "feeling degraded, unappreciated and not welcomed." (Fourth AC ¶ 98.) Plaintiff has also described his experience on the police force, as a result of the allegedly hostile work environment, as "isolating" and likening his status to one of "an escaped convict posing as a police officer." (*Id.*) Plaintiff thus meets this subjective mark.

Unfortunately for Plaintiff, precedent in the Second Circuit neuters his claim with respect to the objective inquiry. To satisfy this standard, "[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief." *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 62 (2d Cir. 1992) (citing *Carrero v. N.Y.C. Hous. Auth.*, 890 F.2d 569, 577 (2d Cir. 1989)). Additionally, the events in question must evince a "racial overtone." *Gong v. City Univ. of N.Y.*, 846 F. App'x 6, 9 (2d Cir. 2021) (summary order). Acts of individualized punishment, however severe or disproportionate, do not give rise to a hostile work environment claim if they lack a connection to the characteristic on which Plaintiff alleges discrimination. *See Pease v. City of New York*, No. 19-CV-7693, 2021 WL 2651400, at *13 (S.D.N.Y. June 28, 2021) (discarding events put forward in a hostile work environment claim that fail to "support[] the inference that these actions were motivated by discriminatory animus rather than, e.g., dissatisfaction with [the] [p]laintiff's performance of his duties"). As the Second Circuit has explained:

> Everyone can be characterized by sex, race, ethnicity or (real or perceived) disability; and many bosses are harsh, unjust, and rude. It is therefore important in

27

> hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals.

*Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002).

Plaintiff directs the Court to 12 discrete episodes besides the events involving Plaintiff's doctors' notes: (1) Weidel's investigation into Plaintiff's military service while attending the police academy in 2002, (Fourth AC ¶ 95); (2) Corbett's 2004 tirade against Plaintiff, (*id.* ¶ 99); (3) Corbett's negative report regarding Plaintiff's handwriting, Plaintiff's subsequent improvement, the department's failure to recognize said improvements, and Reynar's speculation that Plaintiff no longer wrote his own reports, (*id.* ¶¶ 97, 98, 42); (4) Lampert's 2005 report as to Plaintiff's security infraction in the holding cell, (*id.* ¶ 100); (5) Franklin's diatribe the following year against Plaintiff for having written his friend a ticket, (*id.* ¶ 101); (6) the department's 2007 splitting of Sector Two only after a white officer complained that it was too large, (*id.* ¶ 104); (7) the report the same year by an unnamed officer regarding Plaintiff's shoveling his driveway on a sick day, (*id.* ¶ 102); (8) the department's scheduling accommodations for a newly hired Jewish officer's religious obligations the following year and its comparably poor accommodations for Plaintiff's request, (*id.* ¶ 105); (9), Plaintiff's use of "too many rounds . . . to euthanize an injured animal" in 2010, (*id.* ¶ 107); (10) Franklin's deleting of tickets Plaintiff previously issued as well as the department's reprimand of Plaintiff and its ordering Plaintiff to undergo a psychological test, (*id.* ¶ 108); (11) Plaintiff's refusal in 2013 to provide his personal email address for a political election, (*id.* ¶ 110); and (12) Plaintiff's 2014 evaluation failing to note particular achievements and excellent performance, (*id.* ¶ 111).

### i.  Events That Lack a Connection to Any Protected Class

Many of the events put forward by Plaintiff lack any connection to Plaintiff's national origin, political affiliations, race, or religion.  Where a plaintiff fails to allege facts connecting

actions to an animus related to one's national origin, political affiliations, race, or religion, such

allegations are "too conclusory to permit an inference of discriminatory animus." *Trujillo v. City*

*of New York*, No. 14-CV-8501, 2016 WL 10703308, at *14 (S.D.N.Y. Mar. 29, 2016) (collecting

cases), *aff'd*, 696 F. App'x 560 (2d Cir. 2017).  Specifically, Plaintiff does not allege any facts

that connect his national origin, political affiliation, race, or religion to the following incidents:

whether he stepped into the holding cell in violation of department policy, (Fourth AC ¶ 100);

whether Plaintiff was correct in ticketing Franklin's friend and whether Franklin was wrong to

berate Plaintiff for having done so, (*id.* ¶ 101); whether he was in violation of department policy

for shoveling snow while taking a sick day, (*id.* ¶ 102); whether the Department incorrectly

failed to appreciate his improvements and achievements in 2004 and 2014, respectively (*id.* ¶¶

98, 111); whether he used an inappropriate method to euthanize an animal, (*id.* ¶ 107); and

whether it was appropriate for him to undergo a psychological exam because he accurately saw

tickets were deleted.  *See Salerno v. Town of Bedford*, No. 05-CV-7293, 2008 WL 5101185, at

*8 (S.D.N.Y. Dec. 3, 2008) (holding that, absent additional proof of racial animus, "[a]llegations

of negative job evaluations or excessive reprimands are insufficient to establish a hostile

environment claim").  Nothing Plaintiff avers suggests that these incidents were a result of

anything other than a "personality conflict[] between employees," which is "not the business of

the federal courts."  *Vore v. Ind. Bell Tel. Co.*, 32 F.3d 1161, 1162 (7th Cir. 1994); *see also*

*Pacheco v. N.Y. Presbyterian Hosp.*, 593 F. Supp. 2d 599, 624 (S.D.N.Y. 2009) ("Title VII does

not create a 'general civility code.'" (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523

U.S. 75, 81 (1998))).  Therefore, these events do not factor into the Court's calculus for a hostile

work environment claim on any protected basis.

<u>ii.  Isolated Events That Tangentially Connect to National Origin, Political Actions, Race, and Religion Are Insufficiently Severe and Infrequent to Have Created a Hostile Work Environment</u>

The remaining events are too disparate or insufficiently severe to give rise to a hostile

work environment claim on any potential grounds.  One event offers, at best, a cursory

connection to Plaintiff's national origin: the department's investigation into his background

while in the police academy.  (Fourth AC ¶ 95.)  There, Plaintiff alleges only that the department

was unable to verify his background, including his military service, and thus asked if he in fact

served in the military of the country in which he was born.  This fails to give rise to an inference

that Plaintiff was discriminated against based on his national origin.  Rather, the questions are

"reasonably related" to Plaintiff's hiring, including whether he was honest or lied on his

application following the department's good faith but unsuccessful effort to verify his military

service.  *Kho v. N.Y. & Presbyterian Hosp.*, 344 F. Supp. 3d 705, 722 (S.D.N.Y. 2018) (finding

that comments or questions "reasonably related to [an employee's] ability to adequately perform

her job" militates against an inference of discrimination).  Moreover, even if the Court concluded

that this questioning did give rise to harassment, this isolated incident does not meet the Second

Circuit's standard of "pervasive or continuous" conduct.  *Costello v. N.Y. State Nurses Ass'n*,

783 F. Supp. 2d 656, 680 (S.D.N.Y. 2011); *see Alfano*, 294 F.3d at 379–80 (holding that an

employee could not establish a hostile work environment based on five relatively minor incidents

of harassment over four years, including several that the employer could not remedy due to the

perpetrator's anonymity).  Therefore, the investigation as to Plaintiff's military service, even

when read in concert with Plaintiff's firing, does not give rise to a hostile work environment

claim on the basis of Plaintiff's national origin.

The same can be said about Plaintiff's claim for a hostile work environment due to his

religion.  The only event Plaintiff asserts regarding his religion is the allegedly inferior treatment

of his religious accommodation request compared to that of a newly hired Jewish officer who received a religious accommodation.  (Fourth AC ¶ 105.)  Plaintiff concedes that his request was ultimately granted, albeit it after a slight delay and with one additional condition.  (*Id.*)  Thus, the Court does not find that this constitutes harassment.  But, once again, even if the Court were to assume arguendo that it were, this lone episode "does not come close to the level of harassment courts in this circuit have found to be 'extraordinarily severe.'"  *Yan v. Ziba Mode Inc.*, No. 15-CV-47, 2016 WL 1276456, at *6 (S.D.N.Y. Mar. 29, 2016) (quoting *Albert-Roberts v. GGG Constr., LLC*, 542 F. App'x 62, 64 (2d Cir. 2013)).

Another lone event speaks to Plaintiff's political participation.[13]  Specifically, Plaintiff alleges that his refusal to engage in certain political activities "generated a wave of discriminatory and retaliatory backlash, up to and including Plaintiff's termination."  (Fourth AC ¶ 110.)  Again, this single episode of alleged hostility meets neither the severity nor frequency threshold this Circuit has established.  *See Alfano*, 294 F.3d at 379–80 (holding that an employee could not establish a hostile work environment based on five relatively minor incidents of harassment over four years).  Therefore, Plaintiff cannot plausibly plead a hostile work environment on the basis of his political actions or affiliation.

---

[13] Plaintiff did not specifically name political affiliation or action as a ground for his hostile work environment claim.  However, as noted, the Court must read pro se pleadings "'to raise the strongest arguments they suggest.'"  *Hill v. City of New York*, 820 F. App'x 86, 87 (2d Cir. 2020) (summary order) (quoting *McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 156 (2d Cir. 2017)).  Attacks or retaliation as a result of one's political affiliation is often evaluated on the basis of § 1983 claim for sake of a deprivation of one's First Amendment rights.  *Kohutka v. Town of Hempstead*, 994 F. Supp. 2d 305, 317–22 (E.D.N.Y. 2014) (evaluating whether an employee was retaliated against for sake of her political affiliations).  But because Plaintiff's claims for retaliation under § 1983 were already dismissed with prejudice, *see* II.B.2.b, the Court examines this potential theory on Plaintiff's behalf.  *See Kohutka*, 994 F. Supp. 2d at 326–29 (adjudicating municipality defendant's motion for summary judgment and finding that a material fact existed regarding whether an employee faced a hostile work environment for sake of her political affiliations and actions).

The two remaining incidents touch on Plaintiff's race: Corbett's 2004 outburst that implicated Plaintiff's race, (*see* Fourth AC ¶ 99), and the Department's actions in 2007 to reprimand Plaintiff for having raised objection to the size of Sector Two only to then break up Sector Two when a white officer raised analogous objections, (*id.* ¶ 104).  These two incidents, when viewed together with Plaintiff's filing, are still "too few [and] too separate in time" to establish an abusive or hostile working environment.  *Alfano*, 294 F.3d at 380; *see also Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014) ("The incidents complained of must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." (quotation marks omitted)).  Indeed, the Second Circuit has previously held that "five incidents over a four-year period" were not sufficient to establish a hostile workplace.  *Alfano*, 294 F.3d at 380.  Moreover, the incidents—totaling two over the course of a 15-year career, and which were made three years apart from one another—were too temporally disconnected to sustain Plaintiff's claim.  *See Kalola v. Int'l Bus. Machines Corp.*, No. 13-CV-7339, 2015 WL 861718, at *9 (S.D.N.Y. Feb. 3, 2015) ("Two discriminatory comments, made four years apart, over the course of a decade of employment, are insufficient to sustain a hostile work environment claim.").  Thus, even construing the facts in the light most favorable to Plaintiff, these isolated events years apart do not evince a workplace "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Anderson v. New York City Dep't of Fin.*, No. 19-CV-7971, 2020 WL 1922624, at *8 (S.D.N.Y. Apr. 21, 2020) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010)).

Because discriminatory conduct must be sufficiently pervasive and hostile for Plaintiff's hostile work environment claim to survive, Moving Defendants' Motion with respect to

Plaintiff's claims of this kind is granted.  Given that this is the first adjudication of Plaintiff's claim for a hostile work environment on the merits, this dismissal is without prejudice.

### 5.  Plaintiff Failed to State a Claim for Retaliation Under Title VII and Section 1983

Plaintiff's claims for retaliation remain only against the Town of Ramapo.  Moving Defendants are correct that "this claim is no different from that which this Court rejected when it dismissed the Third Amended Complaint."  (Mov. Defs.' Mem. 21.)  Plaintiff's Fourth AC has not cured its previous deficiencies regarding connecting the protected activities to his termination, be it directly or indirectly, (Op. 27–31), nor its deficiencies regarding the level of adversity the actions posed, (*id.* at 31–38).  Because Plaintiff has raised these claims before and failed to rectify the inadequacies the Court previously identified, Plaintiff's claims for retaliation under Title VII and § 1983 are dismissed with prejudice.  *See Haber v. EOS CCA*, No. 20-CV-6637, 2021 WL 4429501, at *3 (S.D.N.Y. Sept. 27, 2021) ("[B]ecause [the] [p]laintiff has had ample notice of the deficiencies in his complaint but has failed to rectify them, the [c]ourt will dismiss with prejudice and deny leave to amend.").

### III.  Conclusion

For the foregoing reasons, Moving Defendants' Motion To Dismiss is granted.  Because this is the first adjudication of Plaintiff's claims of a hostile work environment on the merits, the dismissal of related claims is without prejudice.  The remaining claims, having been previously adjudicated, are dismissed with prejudice.  If Plaintiff wishes to file a fifth amended complaint addressing the deficiencies discussed in this Opinion & Order with respect to claims dismissed without prejudice Plaintiff must do so within 30 days of the date of this Opinion & Order.  Plaintiff is advised that the fifth amended complaint will replace, not supplement, all prior complaints.  The fifth amended complaint must contain all of the claims, factual allegations, and

exhibits that Plaintiff wishes the Court to consider.  If Plaintiff fails to abide by the 30-day

deadline, the remaining claims may be dismissed with prejudice.

The Clerk of Court is directed to terminate the pending Motion, (Dkt. No. 99), and mail a

copy of this Opinion & Order to Plaintiff.

SO ORDERED.

DATED:        January 13, 2022
              White Plains, New York

_____
KENNETH M. KARAS
United States District Judge